**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

————————————————————————

| | |
|---|---|
| ) | |
| IN RE ULTA SALON COSMETICS ) | No. 07 C 7083 |
| & FRAGRANCE, INC. SECURITIES ) | |
| LITIGATION ) | Judge Gettleman |
| ) | |

————————————————————————

## AMENDED COMPLAINT

Lead Plaintiffs Marc Mirsky, Nedra Fischer and Stephanie Carroll, by their attorneys, allege the following based on the investigation of Plaintiffs' counsel which included a review of United States Securities and Exchange Commission ("SEC") filings by Ulta Salon, Cosmetics & Fragrance, Inc. ("ULTA" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This is a securities class action on behalf of persons who purchased the common stock of ULTA.

2.      Counts I, II and III of this Amended Complaint are brought by Lead Plaintiffs on behalf of persons who purchased the common stock of ULTA in or traceable to the initial public offering ("IPO") of ULTA common stock on or about October 25, 2007 or thereafter in the market until December 10, 2007 alleging violations of the Securities Act of 1933 ("the Securities Act Class Period") ('the Securities Act Class").

3.      Counts IV and V of this Amended Complaint are brought by Lead Plaintiffs on behalf of persons who purchased the common stock of ULTA between October 25, 2007 and December 10, 2007, alleging violations of the Securities Exchange Act of 1934 ("the Exchange Act Class Period") ('the Exchange Act Class").

## JURISDICTION AND VENUE

4.      The claims asserted in Counts I, II and III arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77k and 77o, ("the Securities Act Counts"). This Court has jurisdiction over the claims asserted in the Securities Act Counts pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. §§ 1331.

5.      The claims asserted in Counts IV and V arise under and pursuant to Sections 10(b) and 20(a), of the Securities Exchange Act of 1934 Act ("the Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5 ("the Exchange Act Counts"). This Court has jurisdiction over the claims asserted in the Exchange Act Counts pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331.

6.      Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and §§ 1391(b) and (c). Defendants maintain their principal executive office at 1135 Arbor Drive, Romeoville, Illinois 60446. Certain acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district.

7.      In connection with the acts and conduct alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate wire and telephone communications.

## CLASS ACTION ALLEGATIONS

### The Securities Act Counts

8.      Lead Plaintiffs bring the Securities Act Counts as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Securities Act Class.

9.      The members of the Securities Act Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  More than 8.5 million shares of ULTA common stock were sold in the IPO and their identities can be readily obtained from Defendants' books and records.

10.     Lead Plaintiffs' claims are typical of the claims of the members of the Securities Act Class in that Lead Plaintiffs and each member of Securities Act Class purchased the Company's common stock in or traceable to the IPO during the Securities Act Class Period and sustained injury as a result.

11.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class and has retained counsel competent and experienced in class action and securities litigation.

12.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Securities Act Class is impracticable.  Furthermore, as the damages suffered by individual members of the Securities Act Class may be relatively small, the expense and burden of individual litigation make it impossible for members of Securities Act Class to seek redress individually for the wrongs done to them.  There will be no difficulty in the management of the Securities Act Class as a class action.

13.    Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions affecting solely individual members of the Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

(a)    Whether Defendants' acts and omissions as alleged in the Securities Act Counts of the Amended Complaint violated the Securities Act; and

(b)    Whether the members of the Securities Act Class have sustained damages, and if so, what is the proper measure of damages.

**The Exchange Act Counts**

14.    Lead Plaintiffs bring the Exchange Act Counts as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Exchange Act Class.

15.    The members of the Exchange Act Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  Approximately 57 million shares of ULTA common stock are outstanding.

16.    Lead Plaintiffs' claims are typical of the claims of the members of the Exchange Act Counts in that Lead Plaintiffs and each  member of the Exchange Act Class purchased the Company's common stock during the Exchange Act Class Period and sustained injury as a result.

17.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and has retained counsel competent and experienced in class action and securities litigation.

18.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Exchange Act Class is impracticable.  Furthermore, as the damages suffered by individual members of the Exchange Act Class may be relatively small, the expense and burden of individual litigation make it impossible

4

for members of the Exchange Act Class to seek redress individually for the wrongs done to them. There will be no difficulty in the management of the Exchange Act Class as a class action.

19.    Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions affecting solely individual members of the Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

(a)    Whether Defendants' acts and omissions as alleged in the Exchange Act Counts of the Amended Complaint violated the Exchange Act; and

(b)    Whether the members of the Exchange Act Class have sustained damages, and if so, what is the proper measure of damages.

## THE PARTIES

### A.    Plaintiffs

20.    (a)    Lead Plaintiff Marc Mirsky purchased the common stock of ULTA in the IPO, as set forth in his certification attached to his original complaint.  Lead Plaintiff Mirsky has suffered damages as the result of Defendants' wrongdoing alleged in each separate count of this Amended Complaint.

(b)    Lead Plaintiff Nedra Fischer purchased the common stock of ULTA, as set forth in her certification attached to her motion for appointment as Lead Plaintiff.  Lead Plaintiff Fischer has suffered damages as the result of Defendants' wrongdoing alleged in each separate count of this Amended Complaint.

(c)    Lead Plaintiff Stephanie Carroll purchased the common stock of ULTA, as set forth in her certification attached to her motion for appointment as Lead Plaintiff.  Lead Plaintiff Carroll has suffered damages as the result of Defendants' wrongdoing alleged in each separate count of this Amended Complaint.

5

B.    **Defendants**

21.    ULTA, founded in 1990, promotes itself as the largest beauty retailer providing one-stop shopping for prestige, mass and salon products and salon services in the United States.  At the time of the IPO, the Company operated approximately 232 retail stores located in 30 states and also distributed its products through its website.   The registration statement and Prospectus, SEC Form S-1/A, for the IPO was signed on October 24, 2007 and filed on October 24, 2007 and SEC Form 425B1 was filed on October 25, 2007 (collectively "the Prospectus").  ULTA sold 7,666,667 shares of its common stock in the IPO at the price of $18.00 per share.  The proceeds of the IPO were to be used by ULTA to pay $93.0 million of accumulated dividends in arrears on its preferred stock, to pay the approximate $4.8 million redemption price of the Series III preferred stock and to reduce the Company's borrowings with the remaining proceeds.  In addition, certain selling shareholders sold 1.3 million shares of ULTA's common stock in the IPO.  At the close of the first day of trading on October 25, 2007, the price of ULTA's common stock increased to $29.82 per share. ULTA's third quarter of fiscal 2007 ended November 3, 2007 ("Fiscal Third Quarter"),  nine days after the IPO.  ULTA's fiscal year ended February 2, 2008 ("Fiscal 2007").

22.    Lynelle P. Kirby ("Kirby"), was, at all relevant times, the Company's President and Chief Executive Officer and a Director of the Company.  Kirby has held those positions since December 1999.  Kirby signed the Prospectus.  After the IPO, Kirby became holder of 5.2% of ULTA's common stock.

23.    Gregg R. Bodnar ("Bodnar"), was, at all relevant times, the Company's Chief Financial Officer ("CFO").  Bodnar has held that position since October 2006.  Bodnar signed the Prospectus.

## FACTUAL ALLEGATIONS

24.      ULTA completed its IPO on October 25, 2007, selling 7.6 million shares priced at $18 per share.   ULTA raised over $153 million.  The selling shareholders sold 1.3 million shares and the Company received none of the proceeds from the sale of those shares.  As the Company stated in its press release:

> Ulta Salon, Cosmetics & Fragrance, Inc. (the "Company") (NASDAQ: ULTA) today announced the pricing of its initial public offering of 8,539,648 shares of common stock, at a price of $18.00 per share. The shares will be listed on the NASDAQ Global Select Market on October 25, 2007 under the symbol "ULTA". Of the 8,539,648 shares of common stock, 7,666,667 shares will be offered by the Company and 872,981 will be offered by the selling stockholders. The underwriters have a 30 day option to purchase up to an additional 1,280,947 shares from the selling stockholders at the initial public offering price less the underwriting discount, to cover over-allotments.

> The Company expects to receive net proceeds of approximately $124.7 million from the offering and intends to use the net proceeds to pay in full the approximately $93.0 million of accumulated dividends in arrears on its preferred stock and the approximately $4.8 million redemption price of the Series III preferred stock, and to use any remaining proceeds to reduce its borrowings under the third amended and restated loan and security agreement. The Company will not receive any proceeds from the sale of common stock by the selling stockholders.

25.      Defendants timed the IPO for October 25, 2007, just nine days before the close of the Fiscal Third Quarter on November 3, 2007.  Prior to the Fiscal Third Quarter, ULTA had experienced positive trends in its revenues and net income and the Prospectus, in the "Management's discussion and analysis of financial condition and results of operation" ("the MD&A"), states, at page 32:

> Over the past seven years, we believe we have demonstrated our ability to deliver profitable sales and square footage growth. From Fiscal 1999 to fiscal 2006 we grew our net sales and square footage at a compound growth rate of 20.3% and 16.0%, respectively, while delivering increases in net income at a compounded annual growth rate of 51.6%.  In addition, we have achieved 30 consecutive quarters of positive comparable sales growth since fiscal 2000.  In fiscal 2006, we achieved net sales and net income of $755.1 million and $22.5 million, respectively.

7

26.    As stated in the Prospectus, in the MD&A at page 33, Defendants discussed their

growth plans for ULTA, commencing in Fiscal 2007.  The Prospectus states that:

> With the successful development and execution of ULTA's consumer experience
> strategy over the last several years, we began to accelerate our store unit growth in
> fiscal 2007 to approximately 25%, compared to the average growth rate of 17%
> achieved in fiscal 2005 and 2006, respectively . . . .  To support this rate of store unit
> growth in fiscal 2007 and execute our future growth strategy, we have made and will
> continue to make the necessary infrastructure investments and therefore do not
> expect to sustain the net income growth rates of 68% and 40%, respectively,
> achieved in fiscal 2005 and 2006.

27.    In the Prospectus, ULTA management reported on ULTA's growth and its financial

effect on ULTA through the six months ended August 4, 2007.   At page 34 of the Prospectus,

ULTA management stated that:

> [d]uring the six month ended August 4, 2007, we opened fifteen new stores and our
> comparable store sales increase was 7.8% . . . .  Gross profit as a percentage of net
> sales decreased 1.1 percentage points to 30.0% for the six months ended August 4,
> 2007, compared to 31.1% for the six months ended July 29, 2006.  The decrease is
> primarily due to accelerated depreciation on store assets as a result of our store
> remodel strategy and distribution center expense incurred in connection with the
> start-up of our new Warehouse Management (WM) software system . . . .  Net
> income for the six months ended August 4, 2007 was negatively impacted by $3.0
> million of planned accelerated depreciation related to our store remodel program and
> $2.8 million of WM related costs.

**ULTA'S POSITIVE TRENDS IN ITS SELLING,
GENERAL AND ADMINISTRATIVE EXPENSES**

28.    Throughout the Prospectus, in the financial tables, Defendants reported the positive

financial trends in ULTA's business through August 4, 2007, including the positive trends in its

selling, general and administrative expenses ("SG&A expenses").   Defendants made it quite

apparent in the Prospectus that ULTA had been successful in executing its growth strategy through

August 4, 2007, without sacrificing its historical positive financial trends.

29.     At page 38 of the Prospectus, ULTA management stated that SG&A expenses as a percentage of net sales was 25.1% for the six months ended August 4, 2007, the same percentage it had been for the comparable six months ended July 29, 2006.  The financial tables presented at pages 37 and 43 of the Prospectus showed, on an annual and quarterly basis, respectively, that since January 29, 2005, ULTA's SG&A expenses as a percent of net sales had increased extremely modestly from 24.8% at January 29, 2005 to 25.1% at August 4, 2007.  At page 36 of the Prospectus, ULTA management reported that ULTA's advertising costs were included in the SG&A expenses line item on ULTA's financials.

30.     The financial tables ULTA management included at pages 37 and 43 of the Prospectus presented a very attractive picture of ULTA's most recent three-full-fiscal-year history between January 25, 2005 and February 3, 2007 on an annual basis and on a quarterly basis through August 4, 2007.  While net sales grew 54% in that three-year period to $755 million, SG&A expenses increased by only 0.1% to 24.9%.  On a quarterly basis, ULTA's SG&A expenses in the second quarter of 2007, the three months ended August 4, 2007, were less as a percentage of net sales than they were in the first quarter of 2005.  Thus, ULTA exhibited a long trend of growing its sales revenue, from $128 million in the first quarter of 2005 to $200 million in the second quarter of 2007, without increasing its SG&A expenses as a percentage of those sales.

## ULTA'S POSITIVE TRENDS IN ITS MERCHANDISE INVENTORIES

31.     Throughout the Prospectus, Defendants also reported the positive trends in its merchandise inventories through August 4, 2007.  Defendants reported ULTA's merchandise inventories in ULTA's consolidated balance sheet, at page F-3 of the Prospectus.  At February 3, 2007, the merchandise inventories carried on ULTA's balance sheet were $129 million, 17% of net sales. The Prospectus, at pages F-3 and F-5, also reported that at January 28, 2006, the merchandise

inventories carried on ULTA's balance sheet were $109 million, 18.5% of net sales. This decline in merchandise industry levels as a percent of net sales, in the face of a 30% increase in net sales was a positive trend. With the significant growth in operations and new stores through Fiscal 2007, Defendants reported that ULTA's merchandise inventories at August 4, 2007 had risen by only 15% from February 3, 2007 to $148.6 million.

**THE SEC'S COMMENTS ON THE PROSPECTUS**

32.    On August 3, 2007, Defendants received a comment letter form the SEC with respect to ULTA's proposed prospectus, amendment No. 1. Among the SEC staff comments were the following "requests:"

> (a)    "Please expand your MD&A to discuss known material trends and uncertainties that will have, or are reasonably likely to have, a material impact on your revenues or income or result in your liquidity decreasing or increasing in any material way. In this regard, we note your disclosure that from 1999 to 2006 you have delivered increases in net income at a compounded annual growth rate of 51.6%. Discuss whether you expect that trend to continue. Please provide additional analysis concerning the quality and variability of your earnings and cash flows so that investors can ascertain the likelihood or the extent past performance is indicative of future performance. Please discuss whether you expect levels to remain at this level or to increase or to decrease. Also, you should consider discussing the impact of any changes on your earnings. Further, please discuss in reasonable detail . . . material opportunities, challenges, and risks in short and long term and the actions you are taking to address them."

> (b)    "Please revise the last sentence of the first quarter fiscal 2007 selling, general, and administrative discussion to indicate that the decrease relates to the percentage of sales, not to an overall decrease. Also, please explain to us in greater detail what operational change took place, or if no such change, how the amount of advertising expensed is in accordance with generally accepted accounting principles."

33.    In response to comment (b), above, ULTA advised the SEC on August 17, 2007, that the advertising expense consisted principally of the costs related to ULTA's advertising circulars which costs are expensed in the periods in which the advertising takes place. Typically, every week

in the fiscal quarter has an advertising event for which there is an advertising circular which costs are expensed in that period.  In response to comment (a), above, ULTA advised the SEC that it had made certain changes to pages 38 and F-15 of the prospectus.

34.    On September 14, 2007, Defendants received another comment letter form the SEC with respect to ULTA's proposed prospectus, amendment No. 2.  Among the SEC staff comments were the following "requests:"

    (a)    "We note your discussion of trends in your industry and your plans to take advantage of those trends.  Please expand your discussion to also include known risks, challenges or uncertainties that will have, or are reasonably likely to have, a material impact on your revenues, income, or your liquidity."

    (b)    "Please revise to update the unaudited interim financial statements to include the 26 weeks ended August 4, 2007 in accordance with Rule 3-12 of Regulation S-X."

35.    In response to comment (a), above, ULTA advised the SEC on September 27, 2007, that it revised the disclosure on pages 34 and 35 of the prospectus.   In response to comment (b), above, ULTA advised the SEC that it had updated the unaudited interim financial statements at pages F-3, F-5, F-7, F-10 and related notes to the consolidated financial statements included in the prospectus.

36.    Unbeknownst to the market and to the SEC, however, ULTA's operations and financial results for the Fiscal Third Quarter were materially contrary to the trends and risks disclosed in the Prospectus.  ULTA's SG&A expenses and merchandise inventories in the Fiscal Third Quarter had spiked dramatically and were contrary to the trends disclosed in the Prospectus. In addition, ULTA's substantial problems in operating its WM software system used to manage its merchandise levels were not abating in the Fiscal Third Quarter and were causing a financially adverse build-up in unwanted merchandise inventories.

11

37.    Defendants, however, did not disclose these materially adverse facts and trends and did not include any financial information concerning the Fiscal Third Quarter in the Prospectus. Defendants did not disclose in the Prospectus, including the MD&A, that ULTA had accelerated its rate of growth in the Fiscal Third Quarter compared to the rate of growth in the first two quarters of Fiscal 2007, the six months ended August 4, 2007.  Defendants also did not disclose that in order to achieve its goal of opening 50 new stores in Fiscal 2007, more than half of those stores were going to opened in the Fiscal Third Quarter.

38.    Defendants did not disclose in the Prospectus that ULTA had materially increased its advertising expenses in the Fiscal Third Quarter, including advertising expenses for advertising circulars, both in dollar amount and as a percentage of net sales.  In fact, by the date of the IPO, ULTA's SG&A expenses for the Fiscal Third Quarter, which ended only nine days after the date of the Prospectus, had increased dramatically and stood at approximately $55.6 million, a 36% increase from the prior year's fiscal third quarter.   This increase in SG&A expense was contrary to ULTA's historical trends discussed in the Prospectus.

39.    Defendants also did not disclose that by the date of the IPO,  ULTA had experienced a dramatic increase in its merchandise inventories which had ballooned to approximately $219 million.  That level of merchandise inventories, which was trending to actually exceed ULTA's net sales for the Fiscal Third Quarter, was contrary to ULTA's historical merchandise inventory levels and trends.   For example, at the end of  the fiscal third quarter of fiscal 2006, the three months ended October 28, 2006,  merchandise inventory levels stood at $156.8 million, less than the amount of net sales recorded for that period, and represented a 35% increase over ULTA's $148.6 million in merchandise inventories at August 4, 2007, disclosed in the Prospectus. This level of merchandise

inventories also represented an increase of approximately $62 million, or 40%, from the prior year's fiscal third quarter of fiscal 2006.

40.    Without any prior corrective disclosures and without any prior warning to the market of the adverse material facts alleged herein above in ¶¶36 through 39 and 44 through 47, ULTA issued its Fiscal Third Quarter earnings press release on December 11, 2008, under the contact name of Bodnar.   Defendants shocked the market by revealing the adverse material facts which were in existence on October 25, 2007, the date of the IPO and the filing and dissemination of the Prospectus.   The earnings press release stated, *inter alia*:

> Selling, general and administrative expenses (SG&A) in the third quarter of fiscal 2007 were $55.6 million, or 26.7% of net sales, compared to $40.8 million, or 24.6% of net sales, in the third quarter of fiscal 2006.   The increase in third quarter SG&A as a percentage of net sales is primarily due to one incremental advertising vehicle during the quarter due to the 53rd week calendar shift as well as incremental advertising expense, both of which were largely offset by increased vendor advertising allowances.   The Company also incurred incremental stock compensation expense of approximately $0.9 million versus the same period last year.
>
> Merchandise inventories at the end of the quarter were $219.5 million reflecting a $62.7 million increase compared to the fiscal 2006 third quarter.   Approximately $42.7 million of the increase resulted from the addition of 49 new stores opened since the end of the fiscal 2006 third quarter. In addition, approximately $15.0 million of the inventory increase relates to the calendar shift.   This calendar shift causes each quarter in fiscal 2007 to begin and end one week later than the comparable prior year quarter.   As a result, the third quarter in fiscal 2007 ended one week closer to Christmas resulting in an additional $15.0 million of seasonal inventory, as measured on an average per store basis.   Excluding the effects of the calendar shift, inventory at November 3, 2007, on an average per store basis, increased 3% compared to the prior year quarter end.

The market reacted to the totally unexpected adverse material facts and the price of ULTA common stock fell, first closing down 20.4% on December 11, 2007 and, thereafter, falling below the offering price of the common stock in the IPO.

13

## COUNT I

### (For Violation of Section 11 of the Securities Act Against All Defendants)

41.     Lead Plaintiffs repeat and re-allege each and every allegation contained in ¶¶1, 2, 4, 6, 7, 8 through 13 and 20 through 40 of this Amended Complaint.  For purposes of this claim, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.  This claim is brought pursuant to Section 11 of the Securities Act.

42.     The common stock of ULTA was issued and sold pursuant to the materially false and misleading Prospectus in violation of Section11 of the Securities Act [15 U.S.C. §§ 77k].

43.     The Prospectus contained material misrepresentations and omitted material facts which caused the artificial inflation of ULTA's stock price, misleading investors, and directly and proximately causing the economic loss suffered by Lead Plaintiffs and the members of the Securities Act Class when the alleged misrepresentations and omissions of material fact, alleged herein to have been withheld from the market, and/or the effects thereof, were revealed causing the members of the Securities Act Class to suffer losses.  The material facts which were misrepresented in and omitted from the Prospectus were in existence at the time of the IPO and were not disclosed until December 11, 2007, when Defendants released ULTA's results for the Fiscal Third Quarter.

44.     The Prospectus contained the following false and misleading statements and omitted the following material facts concerning ULTA's SG&A expenses:

(a)     at pages 7, 20, 37, 43 and 48 of the Prospectus, Defendants included historical charts of ULTA's financials for fiscal quarters in 2007, 2006 and 2005 which showed a clear business trend of flat SG&A expenses as a percentage of net sales.

| Fiscal Year Ended | | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| (Dollars in thousands) | January 29, 2005 | January 28, 2006 | February 3, 2007 | July 29, 2006 | August 4, 2007 |
| Net Sales | $491,152 | $579,075 | $755,113 | $322,026 | $394,562 |
| Costs of Sales | 346,585 | 404,794 | 519,929 | 221,906 | 276,017 |
| Gross Profit | 144,567 | 174,281 | 235,184 | 100,120 | 118,545 |
| Selling, general and administrative expenses | 121,99 | 140,145 | 188,000 | 80,921 | 99,170 |

| | Fiscal Year Ended | | | Six Months Ended | |
| --- | --- | --- | --- | --- | --- |
| (Percentage of net sales) | January 29, 2005 | January 28, 2006 | February 3, 2007 | July 29, 2006 | August 4, 2007 |
| Net Sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Costs of Sales | 70.6% | 69.9% | 68.9% | 68.9% | 70.0% |
| Gross Profit | 29.4% | 30.1% | 31.1% | 31.1% | 30.0% |
| Selling, general and administrative expenses | 24.8% | 24.2% | 24.9% | 25.1% | 25.1% |

**FISCAL QUARTER**

| (Dollars in thousands) | 2005 | | | | 2006 | | | | 2007 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | First | Second | Third | Fourth | First | Second | Third | Fourth | First | Second |
| Net sales | $127,583 | $131,485 | $129,949 | $190,058 | $159,468 | $162,558 | $166,075 | $267,012 | $194,113 | $200,449 |
| Selling, general and administrative expenses | 32,833 | 31,958 | 32,239 | 43,115 | 41,316 | 39,605 | 40,797 | 66,282 | 47,982 | 51,188 |
| **Other operating data:** | | | | | | | | | | |
| Number of stores end of period | 147 | 150 | 158 | 187 | 170 | 177 | 188 | 196 | 203 | 211 |

**FISCAL QUARTER**

| (Percentage of net sales) | 2005 | | | | 2006 | | | | 2007 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | First | Second | Third | Fourth | First | Second | Third | Fourth | First | Second |
| Selling, general and administrative expenses | 25.7% | 24.3% | 24.8% | 22.7% | 25.9% | 24.4% | 24.6% | 24.8% | 24.7% | 25.5% |

These financial charts and the statements made at page 38 of the Prospectus concerning ULTA's SG&A expenses were misleading without any disclosure of the material fact that in the Fiscal Third Quarter, which would close nine calendar days after the date of the Prospectus, ULTA's SG&A

15

expenses were contrary to that historical trend and represented a higher percentage of net sales than ULTA had experienced in 2005, 2006 and the first two quarters of Fiscal, the six months ended August 4, 2007.  It was further materially misleading to not disclose that SG&A expenses in the Third Fiscal Quarter had risen 36% compared to the third quarter of fiscal 2006, the three months ended October 28, 2006, and that, as a percentage of net sales, SG&A expenses would rise 2.1% higher than in the third quarter of fiscal 2006.   By October 25, 2007, the date of the IPO and the Prospectus, ULTA's advertising expenses, net of vendor allowances, all of which had been planned for and committed to prior to October 25, 2007, were materially higher than in prior quarters and had caused ULTA's SG&A expenses to rise materially higher as a percentage of ULTA's increased net sales in the Fiscal Third Quarter.

(b)      at pages 33 and 34,  the Prospectus stated that ULTA's SG&A expenses would increase in the Fiscal Third Quarter by approximately $1.2 million due to stock options that would vest immediately upon completion of the IPO.

> The July 2007 employee option grants included two 316,000 grants to our Chief Executive Officer of which 25% of the fair value of each grant will vest upon the consummation of an initial public offering which will cause a significant increase in our selling, general, and administrative expense in our fiscal 2007 third quarter. We expect to recognize approximately $1.2 million and $1.0 million of share-based compensation in our fiscal 2007 third and fourth quarters, respectively.  At August 4, 2007, there was approximately $7.3 million of unrecognized compensation expense related to unvested stock options. The cost is expected to be recognized over a weighted-average period of approximately three years.

This statement was false and misleading because its omitted the material fact that ULTA's SG&A expenses would rise significantly above that amount because of the increase in advertising expenses, net of vendor allowances,  ULTA had incurred in the Fiscal Third Quarter.

(c)      at pages 34, 36, 40, 41, F-5 and F-16, the Prospectus included a discussion of ULTA's historical SG&A expenses.  The Prospectus omitted the material fact that in the Fiscal

Third Quarter, ULTA had experienced a sharp increase in SG&A expenses due to the increase in advertising expenses, net of vendor allowances, planned for and spent in the Fiscal Third Quarter, which was contrary to the trend of those historical expenses.

(d)     at page 33, the Prospectus included the statement that "we plan to continue to improve our operating results by . . . decreasing our selling, general and administrative expenses, as a percentage of sales." This statement was false and misleading because the Prospectus failed to disclose that at the time of the IPO, ULTA's SG&A expenses had actually increased as a percentage of net sales in the Fiscal Third Quarter and that the increase was the result of Defendants' plan to increase advertising expenses, net of vendor allowances, in the Fiscal Third Quarter.

(e)     at page 64, under the heading "Marketing and Advertising," the Prospectus states that, "[o]ur gross advertising budget over the next five years is decreasing as a percentage of sales, due in part to the effectiveness of our strategy of opening new stores in existing markets as well as the cost effectiveness we are able to achieve as our catalogs and newspaper inserts circulate more widely. This statement was false and misleading because the Prospectus failed to disclose that at the time of the IPO, ULTA's SG&A expenses had actually increased as a percentage of net sales in the Fiscal Third Quarter and that the increase was the result of Defendants' plan to increase advertising expenses, net of vendor allowances, in the Fiscal Third Quarter.

45.     The Prospectus contained the following false and misleading statements and omitted the following material facts concerning ULTA's merchandise inventories:

(a)     at page 20, the Prospectus includes the statement that the "effectiveness of our inventory management" was a risk that could impact comparable store sales and quarterly financial performance.

(b)     at page 63, the Prospectus, under the heading "Merchandising" and sub-heading "Planning and Allocation," includes the statement that ULTA has "developed a disciplined approach to buying and dynamic inventory planning and allocation process to support our merchandising strategy."

(c)     at page F-3, the Prospectus, includes historical balance sheets for January 28, 2006, February 3, 2007 and August 4, 2007, which showed a clear business trend of merchandise inventories rising by 15% to 18% per fiscal quarter.

| (Dollars in thousands) | January 28, 2006 | February 3, 2007 | August 4, 2007 |
|---|---|---|---|
| | | | (Unaudited) |
| Current Assets: | | | |
| Cash and cash equivalents | $  2,839 | $   3,645 | $   3,165 |
| Receivables, net | 15,757 | 18,476 | 14,295 |
| Merchandise inventories | 109,374 | 129,237 | 148,559 |
| Prepaid expenses and other current assets | 14,942 | 15,276 | 23,292 |
| Deferred income taxes | 2,539 | 5,412 | 5,476 |
| Total Assets | $282,615 | $338,597 | $397,594 |

(d)     at page 65, the Prospectus includes a description of ULTA's warehouse and SAP-based WMS, as follows:

**Distribution**

Our distribution facility (including an overflow facility) is located in an approximately 317,000 square foot facility in Romeoville, Illinois.

* * *

Inventory is shipped from our suppliers to our distribution facility. We carry over 21,000 products and replenish our stores with such products primarily in eaches (i.e.,

18

less-than-case quantities), which allows us to ship less than an entire case when only one or two of a particular product is needed. Our distribution facility uses a WM software system, which was upgraded in early 2007. Products are bar-coded and scanned using handheld radio-frequency devices as they move within the warehouse to ensure accuracy. Product is delivered to stores using contract carriers. One vendor currently provides store-ready orders that can be quickly forwarded to our stores. We use advance ship notices, or ASNs, and carton barcode labels to facilitate these shipments. We expect to increase the number of vendors using ASNs and carton barcodes to expedite our receiving process.

* * *

We intend to leverage our technology infrastructure and systems where appropriate to gain operational efficiencies through more effective use of our systems, people and processes. We update the technology supporting our stores, distribution infrastructure and corporate headquarters on a continual basis. From fiscal 2006 through fiscal 2007, we will have invested $22.6 million to improve the technology in our distribution infrastructure, stores and corporate headquarters.

* * *

During 2007, we have launched several initiatives to support our expected growth, including the transition of a legacy WM software system initiatives to support our expected growth, including the transition of a legacy WM software system to the core purchased software program, construction of a modern, secure data center, a technical upgrade of the same purchased software program system and an update of our website technology.

(e)    the risk factor statements included in the Prospectus, at pages 10 and 11,

concerning ULTA's distribution and order fulfillment infrastructure, distribution facility, and

information systems, were false and misleading, because those systems were not functioning

properly at the time of the IPO, for the reasons alleged in ¶47, hereof, causing ULTA's merchandise

inventory levels to rise to unprecedented and unwanted levels.

46.    At page 58, the Prospectus includes a discussion of "Key trends" in ULTA's

business. That discussion was materially misleading because the Prospectus failed to state that,

contrary to the historical trends described in the Prospectus, ULTA had experienced an increase in

both SG&A expenses and merchandise inventories in the Fiscal Third Quarter which was contrary to ULTA's historical trends.

47.    The statements identified in ¶¶45-46, hereof, were false and misleading at the time of the October 25, 2007 IPO and Prospectus because, at that time, ULTA's inventory management was highly ineffective, causing ULTA's merchandise inventories to have ballooned 40% to approximately $219 million in the Fiscal Third Quarter, an unprecedented level for ULTA.

(a)    ULTA divided its warehouse into groups.  The Inbound Group received all shipments into the warehouse from ULTA's vendors.  The Outbound Group was responsible for shipping all products to ULTA stores.  The Cross-dock and Put-away Group was responsible for taking products from the inbound shipping dock and putting them on the outbound dock for quick shipment to ULTA stores ("cross-docking").  This group was also responsible for taking the products received from vendors which were not cross-docked and putting them in the warehouse for storage until shipment to ULTA stores ("put-away").  The Picking Group was responsible for locating specific items in inventory in the warehouse and putting them on the proper conveyor belt for transport to the proper outbound shipping dock to a specific ULTA store ("non-bulk picking").  The Distro Group was responsible for bulk picking, that is, preparing large amounts of product for shipment to all ULTA stores.

(b)    Prior to the IPO, ULTA used a Warehouse Management System ("WMS") to receive, track and manage the merchandise inventory in the warehouse and at ULTA stores.  This was a stand-alone system by Trackware.  Prior to the IPO, ULTA made the decision to convert its WMS to a new system developed by SAP.  ULTA originally planned to have the new SAP-based WMS in full operation by October 2006.  Consultants from SAP and third-party computer programmers were brought in to implement the conversion and were responsible for programming

the SAP-based WMS to generally conform to ULTA's existing practices.  ULTA personnel worked

with these persons to provide them ULTA's standard operating procedures.

(c)    Due to implementation problems, ULTA continually postponed the launch

date of the SAP-based WMS.  In February 2007, ULTA began to utilize the SAP-based WMS for

the picking function but the remaining functions were still not able to be fully or effectively

deployed at that time.  Piecemeal implementation of the SAP-based WMS compounded ULTA's

inventory management problems.

(d)    Between February 2007 and the October 25, 2007 date of the IPO and

Prospectus, ULTA had considerable difficulty managing its merchandise inventories and, in

particular, tracking its merchandise inventories within the warehouse.  This ineffective inventory

management caused numerous problems for ULTA, including the unwanted build-up of huge

volumes of merchandise inventories in the warehouse.   In an effort to solve the problems, ULTA

scheduled weekly and daily meetings at its corporate headquarters attended, at times, by, *inter alia*,

ULTA's Chief Operating Officer, Bruce Barkus, ULTA's Corporate Controller, Chris Lialios,

Inventory Control Managers, Melinda Rolando and John Richter, and Vice President of Operations,

Jodi Holland.  At these meetings, the report tracking the progress of the various SAP-based WMS

functions prepared by Terry Keuhn was reviewed.  These periodic reports provided a "pass/fail"

grade for each of the SAP-based WMS functions tested based on SOPs (Standard Operating

Procedures) ULTA had prepared for each of the SAP-based WMS functions. These reports regularly

reflected a significantly high rate of failure for virtually all system functions.

(e)    Among the resulting major problems which plagued ULTA at the time of the

IPO and the Prospectus were the fact that merchandise inventory in the warehouse would get "lost,"

that is, although the merchandise was in the warehouse, the SAP-based WMS system could not

21

locate the inventory. When merchandise arrived at the warehouse, it would be entered into the SAP-based WMS by scanning the bar codes on the crates or items. The merchandise would then be put away in specified locations in the warehouse. The SAP-based WMS, however, would not then be able to locate the physical merchandise inventory when it was needed to fill an order because the SAP-based WMS did not show any data relating to the receipt and location of the specific merchandise in the warehouse.

(f)    The "lost" inventory created numerous problems for ULTA which had serious adverse consequences. Because this lost inventory problem was pervasive and generally known by ULTA management, ULTA's own buyers were required to and often instructed to purchase duplicative or additional quantities of merchandise from ULTA's vendors in order for the buyers to fulfill their purchasing plans provided by senior management and have the merchandise needed for shipment to ULTA's stores. As a result, ULTA's merchandise inventories were ballooning with unwanted and unneeded merchandise. In 2007, before the IPO, ULTA opened a second warehouse in close proximity to the existing warehouse and corporate headquarters where much of the "excess" inventory was located. However, the SAP-based WMS was unable to track the location of the merchandise stored in the second warehouse.

(g)    The SAP-based WMS also was ineffective in managing ULTA's shipments of merchandise from inventory to its retail stores. On a weekly basis, ULTA's buyers created a report, called the "Distro Report" which informed warehouse personnel in the Distro Group which items in inventory were to be shipped to ULTA's stores. The Distro Report contained item identifying numbers, the quantity of items on hand in the warehouse, the quantity of units to be shipped to ULTA's stores and the week the items were to be shipped. The shipment week coincided with ULTA's product advertising and promotion schedule and was critical to ensure that the product

22

was in the stores at the time it was advertised. Thus, shipment weeks were denominated, for example, "Ad Week 1." The Distro Report was accessed by the Distro Group through the WMS on a daily basis. Prior to the conversion to the SAP-based WMS, the Distro Reports were accurate and enabled the shipment from warehouse to store to proceed efficiently. However, the SAP-based WMS generated Distro Reports that were riddled with numerous inaccuracies and prevented the timely shipment of merchandise to ULTA stores. For example, many orders that had been shipped to ULTA stores remained on the Distro Report for months after shipment thereby leading to shipment of excessive amounts of merchandise to those stores. Another recurring problem was the inability to locate product in the warehouse that appeared on the Distro Report for shipment. Thus, ULTA stores did not receive necessary merchandise. The problem of timely shipment to ULTA stores from the warehouse to coincide with ULTA's advertising program became so severe that ULTA was forced to resort to very expensive shipment of product to its stores by using Federal Express, at a cost approximating $400,000 in a given week.

(h)     The SAP-based WMS was also ineffective in recording the merchandise received by ULTA from ULTA's vendors. ULTA used purchase orders to order merchandise from its vendors and many of the purchase orders had multiple lines for multiple items being purchased on the purchase order. The SAP-based WMS, however, was not able to record all of the multiple lines on the purchase orders. The merchandise inventories recorded by the SAP-based WMS would, therefore, be understated. This would cause ULTA to again order the unrecorded merchandise from the vendor, even though it had the items in its merchandise inventories because ULTA would not know how much merchandise was actually received and in its merchandise inventories at the warehouse. The inventory management problems were so pervasive that ULTA created an

Inventory Report that was used by ULTA in an effort to quantify by hand the volume of merchandise in inventory that was in the warehouse but unrecorded in the SAP-based WMS.

(i)    This ineffective inventory management also hampered ULTA's ability to accurately order merchandise from its vendors to fill the needs of its retail stores because the SAP-based WMS would not accurately record the levels of merchandise inventories at ULTA's retail stores. ULTA also utilized the services of RGIS, an entity that specialized in conducting retail store-level inventory audits, to conduct inventory audits at each of ULTA's retail stores. RGIS conducted these inventory audits at the rate of approximately four to seven stores per day. The reports generated by RGIS continually showed the discrepancies between the inventories on hand at the retail stores and the inventories recorded on ULTA's SAP-based WMS. Because of these and other problems with ULTA's inventory management, ULTA generated several periodic inventory reports, including the Inventory Shrinkage Report, which among other matters discussed the inventory variance information as a result of the problems described herein. These reports were sent by e-mail virtually every Friday to ULTA personnel including Kirby.

48.    During the Securities Act Class Period, the false and misleading Prospectus misled the investing public, thereby artificially inflating the price of ULTA common stock. The Prospectus contained false and misleading statements and omitted to disclose material facts necessary to make the statements made, as alleged forth herein, not false and misleading. The statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

49. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.

50. The Company is the registrant for its common stock that is the subject of this action. Kirby and Bodnar each signed the Prospectus.

51. As the issuer of the shares, the Company is strictly liable to Lead Plaintiffs and the Securities Act Class for the false and misleading Prospectus.

52. Kirby and Bodnar were negligent and did not made a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Prospectus were true and without omissions of any material facts and were not misleading. Kirby and Bodnar each stood to gain financially by the completion of the IPO in terms of stock ownership and the vesting of stock options in a now-publicly traded company.

53. Defendants issued, caused to be issued and participated in the issuance of the materially false and misleading Prospectus which misrepresented or failed to disclose, *inter alia*, the material facts set forth above in ¶¶36 through 39 and 44 through 47.

54. By reason of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

55. Lead Plaintiffs acquired the Company's common stock issued pursuant to, or traceable to the Prospectus and the IPO.

56. Lead Plaintiffs and the members of the Securities Act Class have sustained damages as the direct and proximate result of Defendants' acts and omissions in violation of the Securities Act. The value of the Company's common stock has declined subsequent to and due to Defendants' violations of the Securities Act.

57.     At the times they purchased the Company's common stock, Lead Plaintiffs and other members of the Securities Act Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Prospectus.

58.     This claim is brought within the applicable statute of limitations.

59.     By virtue of the foregoing, each Defendant is liable to Lead Plaintiffs and members of the Securities Act Class for their violations of Section 11 of the Securities Act and Lead Plaintiffs and the other members of the Securities Act Class are entitled to damages under Section 11 as measured by the provisions of Section 11 (e), from the Defendants and each of them, jointly and severally.

## COUNT II

**(For Violation of Section 12(a)(2) of the Securities Act Against All Defendants)**

60.     Lead Plaintiffs repeat and re-allege each and every allegation contained in ¶¶1, 2, 4, 6, 7, 8 through 13, and 20 through 59 of this Amended Complaint.  For purposes of this claim, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.  This claim is brought pursuant to Section 12(a)(2) of the Securities Act.

61.     By means of the Prospectus, and by using means and instruments of transportation and communication in interstate commerce and of the mails, Defendants, through the IPO, solicited the purchase of ULTA common stock, offered and sold the common stock of ULTA.  As alleged herein above, the Prospectus included untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

26

62.     Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the IPO and Prospectus.

63.     Lead Plaintiffs and the other members of the Securities Act Class purchased ULTA's common stock based on the Prospectus.

64.     Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the omissions and misstatements of material facts in the Prospectus, as alleged above, when they purchased the common stock of ULTA.

65.     Lead Plaintiffs, individually and representatively, hereby tender to Defendants the shares of ULTA common stock on behalf of the members of the Securities Act Class continue to own, in return for the consideration paid for that common stock together with interest thereon. Members of the Securities Act Class who have sold their ULTA common stock are entitled to rescissory damages.

66.     This claim is brought within the applicable statute of limitations.

67.     Kirby and Bodnar acted negligently and without reasonable care regarding the accuracy of the information contained in the Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all respects.

68.     By virtue of the foregoing, Kirby and Bodnar have each violated Section 12(a)(2) of the Securities Act and are each liable to Lead Plaintiffs and the members of the Securities Act Class for violations of Section 15 of the Securities Act and the damages they suffered.

## COUNT III

### (For Violation of Section 15 of the Securities Act Against Kirby and Bodnar)

69.     Lead Plaintiffs repeat and re-allege each and every allegation contained in ¶¶1, 2, 4, 6, 7, 8 through 13 and 20 through 68 of this Amended Complaint.   For purposes of this claim,

Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

70.     This Count is brought by Lead Plaintiffs for violation of Section 15 of the Securities Act against Kirby and Bodnar.  Kirby and Bodnar were each a control person of the Company by virtue of their positions as senior officers and members of the principal management of the Company and as signatories of the Prospectus.  By virtue thereof, Kirby and Bodnar each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of ULTA, including the content of the Prospectus.

71.     ULTA is strictly liable for its violations of Sections 11 and 12(a)(2) of the Securities Act through issuing the prospectus, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements made therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

72.     Kirby and Bodnar were each a culpable participant in the violations of the Securities Act Counts, alleged above.  Kirby and Bodnar each acted negligently and without reasonable care regarding the accuracy of the information contained in the Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all respects.

73.     By virtue of the conduct alleged herein, the Kirby and Bodnar are each liable to Lead Plaintiffs and the members of the Securities Act Class for violations of Section 15 of the Securities Act and the damages they suffered.

**COUNT IV**

**(For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants)**

74.     Lead Plaintiffs repeat and re-allege each and every allegation contained in ¶¶1, 3, 5 through 7, 14 through 40, and 43 through 47 of this Amended Complaint.

75.     During the Exchange Act Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Exchange Act Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other members of the Exchange Act Class, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Exchange Act Class to purchase ULTA common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for ULTA's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

77.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about ULTA's financial well being and business operations, as alleged herein.

78.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct

as alleged herein in an effort to assure investors of ULTA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about ULTA and its business operations in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ULTA common stock during the Exchange Act Class Period.

79.    The false and misleading statements made by Defendants were made in the Prospectus for the IPO and are alleged in ¶¶44 through 47 herein above.

80.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged in ¶¶44 through 47 herein above, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ULTA's true financial and business condition from the investing public and supporting the artificially inflated price of ULTA's common stock. As demonstrated by Defendants' misstatements and omissions of material fact throughout the Exchange Act Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

81.    The facts supporting Defendants' knowledge, recklessness, motive and opportunity are alleged in ¶¶ 21 through 40, 44 through 47 and 93 of this Amended Complaint and the following:

(a)    The close involvement of Kirby and Bodnar in virtually every aspect of ULTA's business and business decisions, including the change to the SAP-based WMS, the growth

30

plans for Fiscal 2007 and the Fiscal Third Quarter, the rate of opening of new stores and the increase in advertising expenditures. They were fully aware of the record number of new stores being opened in the Fiscal Third Quarter and that with the increase in advertising, all in an effort to increase the rate of growth in net sales, ULTA would have to increase its merchandise inventories. They also were knowledgeable of the serious inventory management problems through, *inter alia*, weekly reports directed to them or to which they had access, the increased costs for extraordinary Federal Express shipments, and the reports made to Bruce Barkus, Chief Operating Officer, of the serious problems with the SAP-based WMS during weekly group SAP conversion meetings held in corporate headquarters throughout 2007. These facts and circumstances provide motive and opportunity and support a strong inference that they knew of the material adverse facts which were misrepresented in or omitted from the Prospectus.

(b)    Kirby and Bodnar each signed the Prospectus for the IPO, ten calendar days before the close of the Fiscal Third Quarter. In addition, Bodnar signed the Prospectus as not only Chief Financial Officer but also as Principal Financial and Accounting Officer. Thus, they were directly responsible for and knew or had access to all of the financial information concerning the Fiscal Third Quarter, including the material facts concerning the level of ULTA's SG&A expenses which had been spent and booked on ULTA's internal financial statements and books and records and of the merchandise inventory levels which were recorded on ULTA's balance sheet. Before signing the Prospectus, Kirby and Bodnar were required to conduct due diligence of the material facts concerning ULTA and, to the extent they did not already know by the time they signed the Prospectus on October 24, 2007, they would readily have learned of the substantial increases in SG&A expenses, the ineffective inventory management and the dramatic increase in merchandise

inventory levels and that both of these items were contrary to the historical trends set forth in the Prospectus.

(c)     The Prospectus specifically discusses SG&A expenses and the fact that they will rise by approximately $1 million in the Fiscal Third Quarter by reason of the cost of stock options.  Defendants also knew that the SG&A expenses would rise materially above that amount by reason of the increased advertising expenses, net of vendor allowances, in the Fiscal Third Quarter.  The Prospectus, at page 11, also includes a disclosure concerning the risk of a failure of ULTA's warehouse management software and the adverse impact of a failure on ULTA's business. Defendants either knew when they signed the Prospectus that this risk had become reality for ULTA in the Fiscal Third Quarter or were reckless in not learning of the SAP-based WMS failures and the ballooning of merchandise inventories when they conducted their due diligence before signing the Prospectus.

(d)     Defendants knew from the SEC comment letters, as alleged in ¶¶32 through 35, that they were required, before signing the Prospectus on October 24, 2007, to have determined whether there were any changes in historical trends, whether the adverse material facts concerning the adverse changes in trends, as well as the financial results of the Fiscal Third Quarter, which had virtually closed by the date of the Prospectus, and the ineffective merchandise management systems, were included in the Prospectus.

82.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ULTA who knew that those statements were false when made.

83.    The primary liability of Kirby and Bodnar arises from the following facts: (i) each of them was a high-level executive at the Company during the Exchange Act Class Period and members of the Company's management team; (ii) each of them, by virtue of her/his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of them enjoyed significant personal contact and familiarity with each other and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's SG&A expenses, merchandise inventories, operations, and sales at all relevant times; and (iv) each of them was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

84.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, alleged above, the market price of ULTA common stock was artificially inflated during the Exchange Act Class Period.  In ignorance of the fact that market prices of ULTA's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to

or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Exchange Act Class Period, Lead Plaintiffs and the other members of the Exchange Act Class acquired ULTA common stock during the Class Period at artificially high prices and were damaged thereby.

85.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Exchange Act Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Exchange Act Class and the marketplace known the truth regarding the problems that ULTA was experiencing, which were not disclosed by Defendants, as alleged herein, Lead Plaintiffs and other members of the Exchange Act Class would not have purchased or otherwise acquired their ULTA common stock, or, if they had acquired such common stock during the Exchange Act Class Period, they would not have done so at the artificially inflated prices which they paid.  The market for ULTA's common stock was, at all times, an efficient market that promptly digested current information with respect to the Company from publicly-available sources and reflected such information in the prices of the Company's securities. ULTA's common stock was actively traded on the NASDAQ.  The market price of ULTA's common stock reacted promptly to the dissemination of public information regarding the Company. Securities analysts followed and published research reports regarding ULTA that were publicly available to investors.  As a result of the misconduct alleged herein, the market for ULTA's common stock was artificially inflated.  Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Lead Plaintiffs and the other Exchange Act Class members justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of ULTA common

stock at artificially inflated prices and the subsequent decline in the price of those common stocks when the truth was disclosed.

86.    During the Exchange Act Class Period the prices of ULTA's common stock were artificially inflated as a direct result of Defendants' misrepresentation and omissions regarding the Company.  When the truth about the Company was finally revealed to the market on December 11, 2007, at the end of the Class Period, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities as a direct and proximate result of the correct disclosures, causing significant damages to Lead Plaintiffs and other Exchange Act Class members.

87.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their respective purchases of the Company's common stock during the Exchange Act Class Period.

## COUNT V

### (For Violations of Section 20(a) of the Exchange Act
### Against Kirby and Bodnar)

89.    Lead Plaintiffs repeat and re-allege each and every allegation contained in or re-alleged in Count IV hereof,  above as if fully set forth herein.

90.    Kirby and Bodnar each acted as a controlling person of ULTA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Prospectus with the SEC and disseminated to the

investing public, Kirby and Bodnar each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the Prospectus.  They were provided with or had unlimited access to copies of the Company's internal reports and signed the Prospectus and it could not have been issued without their signatures.

91.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the timing of the IPO and the contents of the Prospectus.

92.     As set forth above, ULTA, Kirby and Bodnar each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Amended Complaint.  By virtue of their positions as controlling persons, Kirby and Bodnar are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's common stock during the Exchange Act Class Period.

## CONFIDENTIAL SOURCES OF INFORMATION

93.     The following former employees of ULTA were interviewed and provided relevant information which forms the factual basis for the allegations made in ¶¶45, 47 and 81 hereof.

(a)     Former Employee 1 ("FE1") was employed by ULTA as Inbound Manager at ULTA's main warehouse in Romeoville from May 2005 until October 2007.  The Inbound Group was responsible for all aspects concerning the receipt of merchandise at the warehouse.  FE 1 reported to ULTA's Vice President of Distribution/Supply Chain Matt Strall who reported to Vice President of Operations John Bloomfield.  FE 1 worked closely with Outbound Manager and General Warehouse Manager Craig Pacha who also reported to Strall.

(i)    FE 1 was responsible for all functions of the Inbound Group, including, unloading products from trucks, bar code tagging, routing products to appropriate locations in the warehouse, ensuring that the products were entered into the WMS and tracking the products in the warehouse. The main warehouse was approximately 245,000 square feet and approximately 400 to 500 employees worked at the warehouse, depending upon the season. Approximately 220 employees worked the day shift. In the summer of 2007, ULTA leased a second warehouse containing approximately 60,000 square feet.

(ii)    The Cross-dock and Put-away Group was responsible for taking products from the inbound shipping dock and putting them on the outbound dock for quick shipment to ULTA stores, a process known as "cross-docking." This group was also responsible for taking the products received from vendors which were not cross-docked and putting them in the warehouse for storage until shipment to ULTA stores ("put-away").

(iii)    Prior to the IPO, ULTA used a Warehouse Management System ("WMS") to receive, track and manage the merchandise inventory in the warehouse and at ULTA stores. This was a stand-alone system by Trackware. Prior to the IPO, ULTA made the decision to convert its WMS to a new system developed by SAP. ULTA originally planned to have the new SAP-based WMS in full operation by October 2006. Due to implementation problems, ULTA continually postponed the launch date of the SAP-based WMS.

(iv)    In February 2007, ULTA began to utilize the SAP-based WMS although many aspects of the system were not fully deployed at that time. ULTA had considerable difficulty managing its merchandise inventories and, in particular, tracking its merchandise inventories within the warehouse. This ineffective inventory management caused numerous problems for ULTA, including the unwanted build of huge volumes of merchandise inventories in

37

the warehouse.  These problems persisted from February 2007 through October 2007 when FE1 left the employ of ULTA.

(v)    In an effort to solve the problems, ULTA scheduled weekly and daily meetings at its corporate headquarters attended, at times, by, *inter alia*, ULTA's Chief Operating Officer, Bruce Barkus, ULTA's Corporate Controller, Chris Lialios, Inventory Control Managers, Melinda Rolando and John Richter, and Vice President of Operations, Jodi Holland, Matt Strall and Craig Pacha.  At these meetings, the report tracking the progress of the various SAP-based WMS functions prepared by Terry Keuhn was reviewed.  These periodic reports provided a "pass/fail" grade for each of the SAP-based WMS functions tested based on SOPs (Standard Operating Procedures) ULTA had prepared for each of the SAP-based WMS functions. These reports regularly reflected a significantly high rate of failure for virtually all system functions.

(vi)    Among the resulting major problems was the fact that merchandise inventory in the warehouse would get "lost," that is, although the merchandise was in the warehouse, the SAP-based WMS system could not locate the inventory.  When merchandise arrived at the warehouse it would be entered into the SAP-based WMS by scanning the bar codes on the crates or items.  The merchandise would then be put away in specified locations in the warehouse.  The SAP-based WMS, however, would not then be able to locate the physical merchandise inventory when it was needed to fill an order because the SAP-based WMS did not show any data relating to the receipt and location of the specific merchandise in the warehouse.  This problem was pervasive. ULTA's buyers were required to purchase additional quantities of merchandise from ULTA's vendors in order for ULTA to have the merchandise needed for shipment to ULTA's stores.  In late 2007, one $250,000 shipment from a vendor was "lost" in the warehouse and in the SAP-based WMS.  The Shipping Group also had problems.

(vii)    One notable problem was that after items had been shipped to ULTA's stores, the SAP-based WMS often did not indicate that the items had indeed been shipped from the warehouse to the stores. ULTA used purchase orders to order merchandise from its vendors and many of the purchase orders had multiple lines for multiple items being purchased on the purchase order. The SAP-based WMS, however, was not able to record all of the multiple lines on the purchase orders and the merchandise inventories recorded by the SAP-based WMS would, therefore, be understated.

(viii)    In mid-2007, Matt Stall and Craig Pacha created an Inventory Report to account for the missing inventories which quantified the dollar amount of the missing inventories.

(b)    Former Employee 2 ("FE 2") was employed by ULTA as Inventory Analyst from November 2001 until 2004 and Inventory Specialist from 2004 until November 2007. FE 2 reported to Inventory Control manager Melinda Rolando who reported to Corporate Controller Chris Lialios who reported to Director of Finance Joe Adante who reported to Chief Financial officer Gregg Bodnar. FE 2 interacted with District Managers, including Cathey Lenz and Debbie Rothe.

(i)    FE 2 conducted ongoing reconciliations between inventory counts at the store level (*i.e.*, actual on-hand inventory) and the inventory data for stores as recorded in the WMS. ULTA utilized the services of RGIS, an entity that specialized in conducting retail store-level inventory audits, to conduct inventory audits at each of ULTA's retail stores. By November 2007, ULTA had more than 200 retail stores. RGIS conducted these inventory audits at the rate of approximately four to seven stores per day. The reports generated by RGIS continually showed the discrepancies between the inventories on hand at the retail stores and the inventories recorded on ULTA's SAP-based WMS. FE 2 would attempt to reconcile the discrepancies and would use Negative On-Hand Inventory Reports generated by ULTA.

(ii)    The majority of the variances could be traced to hasty or incompetent shipping practices from the warehouse to the individual stores. One common problem was that the "pickers" in the warehouse could not locate all of the products that were to be shipped to ULTA's stores but the shipment would be scanned into the SAP-based WMS as a full shipment indicating that all of the product had been shipped when if fact it had not been shipped. Under the SAP-based WMS, ULTA's inventory processes and controls as a whole were worsening. In summer 2007, because of escalating variances between the inventory data in the SAP-based WMS and the RGIS inventory audits ULTA personnel, including Sarbanes Oxley Compliance Director Marie McWard, met in effort to resolve the problem and had a subsequent meeting in corporate headquarters to discuss their findings and assessments of the inventory variance problem. A report was generated by Angelica Galvin, McWard's subordinate. Subsequent to that, FE 1 believes that ULTA's inventory issues worsened.

(iii)    Because of these and other problems with ULTA's inventory management, ULTA generated several periodic inventory reports, including the Inventory Shrinkage Report, which among other matters discussed the inventory variance information as a result of the problems described herein. These reports were sent by e-mail virtually every Friday to ULTA personnel including Lynn Kirby and Bruce Barkus.

(c)    Former Employee 3 ("FE 3") was employed by ULTA from October 1995 until October 2007. FE 3 worked in the warehouse facility adjacent to ULTA's main headquarters and was the Team Lead for the Distro Group. Beginning in mid-2006 until October 2007, FE 3 reported to Warehouse Manager Doug Anderson who reported to General Warehouse Manager Craig Pacha. FE 3 regularly interacted with General merchandise manager Jodi Williams, Inventory Control Manager John Richter and warehouse "Fed-Ex guy" Brett Pierson.

(i)    ULTA divided its warehouse into groups. The Inbound Group received all shipments into the warehouse from ULTA's vendors. The Outbound Group was responsible for shipping all products to ULTA stores. The Cross-dock and Put-away Group was responsible for taking products from the inbound shipping dock and putting them on the outbound dock for quick shipment to ULTA stores ("cross-docking"). This group was also responsible for taking the products received from vendors which were not cross-docked and putting them in the warehouse for storage until shipment to ULTA stores ("put-away"). The Picking Group was responsible for locating specific items in inventory in the warehouse and putting them on the proper conveyor belt for transport to the proper outbound shipping dock to a specific ULTA store ("non-bulk picking"). The Distro Group was responsible for bulk picking, that is, preparing large amounts of product for shipment to all ULTA stores.

(ii)    Prior to the IPO, ULTA used a Warehouse Management System ("WMS") to receive, track and manage the merchandise inventory in the warehouse and at ULTA stores. This was a stand-alone system. ULTA began using a new SAP-based WMS. Consultants from SAP and third-party computer programmers were brought in to implement the conversion and were responsible for programming the SAP-based WMS to generally conform to ULTA's existing practices.

(iii)    FE 3 was one of approximately 20 "testers" who were stationed in a conference room in ULTA's headquarters at various times in 2006 who used scripts customized to their respective warehouse functions to test the effectiveness of the new SAP-based WMS. There were a very high amount of test results for all warehouse functions that "failed." ULTA personnel worked with these persons to provide them ULTA's standard operating procedures.

(iv)    Due to ongoing system implementation problems, ULTA decided to prepare and launce only a portion of the SAP-based WMS in February 2007, ULTA began to utilize the SAP-based WMS for the picking function but the remaining functions were still not able to be fully or effectively deployed at that time.

(v)    One of the most prominent issues with the SAP-based WMS related to inventory tracking. ULTA had considerable issues tracking inventory within the warehouse. This inability to effectively track inventory caused ULTA to accumulate more inventory than it actually needed to fulfill demand. On a regular basis when merchandise arrived at the warehouse it would be entered into the SAP-based WMS by scanning the bar codes on the crates or items. The merchandise would then be put away in specified locations in the warehouse. The SAP-based WMS, however, would "lose" the inventory because it could not locate the physical merchandise inventory when it was needed to fill an order because the SAP-based WMS did not show any data relating to the receipt and location of the specific merchandise in the warehouse. This problem began in February 2007 when the SAP-based WMS was launched and continued until FE 3 left ULTA in October 2007.

(vi)    Because this problem was pervasive and known, ULTA's General merchandise Manager, Jodi Williams, who managed all of ULTA's buyers, ULTA's own buyers were required to and often instructed to purchase duplicative or additional quantities of merchandise from ULTA's vendors in order for the buyers to fulfill their purchasing plans provided by senior management and have the merchandise needed for shipment to ULTA's stores. As a result, ULTA's merchandise inventories were ballooning with unwanted and unneeded merchandise.

(vii)    In 2007, ULTA opened a second warehouse in close proximity to the existing warehouse and corporate headquarters where much of the "excess" inventory was located.

However, the SAP-based WMS had difficulty tracking and accounting for the inventory in the second warehouse.

(viii)    On a weekly basis ULTA's buyers created a report, called the "Distro Report" which informed warehouse personnel in the Distro Group which items in inventory were to be shipped to ULTA's stores.  The Distro Report contained item identifying numbers, the quantity of items on hand in the warehouse, the quantity of units to be shipped to ULTA's stores and the week the items were to be shipped.  The shipment week coincided with ULTA's product advertising and promotion schedule and was critical to ensure that the product was in the stores at the time it was advertised.  Thus, shipment weeks were denominated, for example, "Ad Week 1."  The Distro Report was accessed by the Distro Group through the WMS on a daily basis.

(ix)    Prior to the conversion to the SAP-based WMS, the Distro Reports were accurate and enabled the shipment from warehouse to store to proceed efficiently.  However, the SAP-based WMS generated Distro Reports had regular and significant inaccuracies.   For example, many orders that had been shipped to ULTA stores remained on the Distro Report for three months after shipment. The problem of timely shipment to ULTA stores from the warehouse t became so severe that ULTA was forced to resort to very expensive shipment of product to its stores by using Federal Express, at a cost approximating $400,000 in a given week.

(x)    ULTA's Chief Operating Officer Bruce Barkus visited the warehouse and spoke with various personnel, including FE 3.  In some of these conversations particularly in the latter part of 2007, FE 3 told Barkus of the many problems in the Distro Group, including the problematic SAP-based WMS, the inventory accumulations and the inventory control problems, including lost inventory and inventory not being timely shipped.  Barkus indicated he would look into the problems.  Barkus left ULTA in March 2008 and his position was not filled by the

Company, his responsibilities were assumed by members of the existing executive team.  According to Kirby, "Bruce was just not the right solution for us and was not the right structure for us at this point in time."

## **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs demand judgment:

1.     Determining that the Securities Act Counts and the Exchange Act Counts are a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure and that Lead Plaintiffs be appointed representatives of the Classes and their counsel be appointed counsel for the Classes;

2.     Awarding compensatory damages and/or rescission as appropriate against Defendants, in favor of Lead Plaintiffs and all members of the Securities Act Class and the Exchange Act Class for damages sustained as a result of Defendants' wrongdoing;

3.     Awarding Lead Plaintiffs and members of the Securities Act Class and Exchange Act Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

4.     Awarding such other and further relief as the Court may deem just and proper.

DATED: May 19, 2008

*/s/ Marvin A. Miller*
Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 S. LaSalle Street
Suite 2910
Chicago, IL 60603
312-332-3400

Liaison Counsel for Lead Plaintiffs

Deborah R. Gross
Robert P. Frutkin
**LAW OFFICES BERNARD M. GROSS, P.C.**
Suite 450, John Wanamaker Building
Philadelphia, PA 19107
215-561-3600

Lead Counsel for Lead Plaintiffs

Kenneth Elan
**LAW OFFICES KENNETH ELAN**
217 Broadway, Suite 606
New York , NY 10007
212-619-0261

Carol V. Gilden
**COHEN MILSTEIN HAUSFELD &**
**TOLL, PLLC**
190 S. LaSalle Street, Suite 1705
Chicago, IL 60603
312-357-0370

Additional attorneys for Lead Plaintiffs

45

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demand a trial by jury of all of the claims

asserted in this Complaint so triable.

Dated:  May 19, 2008


                               */s/ Marvin A. Miller*
                               Marvin A. Miller
                               Lori A. Fanning
                               **MILLER LAW LLC**
                               115 S. LaSalle Street
                               Suite 2910
                               Chicago, IL 60603
                               312-332-3400
                               Liaison Counsel for Lead Plaintiffs


                               Deborah R. Gross
                               Robert P. Frutkin
                               **LAW OFFICES**
                               **BERNARD M. GROSS, P.C.**
                               Suite 450, John Wanamaker Building
                               Philadelphia, PA 19107
                               215-561-3600

                               Lead Counsel for Lead Plaintiffs

                               Kenneth Elan
                               **LAW OFFICES KENNETH ELAN**
                               217 Broadway, Suite 606
                               New York , NY 10007
                               212-619-0261

                               Carol V. Gilden
                               **COHEN MILSTEIN HAUSFELD &**
                                    **TOLL, PLLC**
                               190 S. LaSalle Street, Suite 1705
                               Chicago, IL 60603
                               312-357-0370

                               Additional attorneys for Lead Plaintiffs