## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| IN RE ULTA SALON, COSMETICS & FRAGRANCE, INC. SECURITIES LITIGATION | Master File No. 07 C 7083 |
| This Document Relates To:<br>All Actions | CLASS ACTION<br><br>Hon. Robert W. Gettleman |

Dated:  July 21, 2008

**LATHAM & WATKINS LLP**
Sean M. Berkowitz
Michael J. Faris
Nicholas B. Gorga
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Tele:  (312) 876-7700
Fax:  (312) 993-9767

*Counsel for Defendants Ulta Salon,*
*Cosmetics & Fragrance, Inc.,*
*Lynelle P. Kirby, and Gregg R. Bodnar*

## MEMORANDUM IN SUPPORT OF THE MOTION TO DISMISS THE AMENDED COMPLAINT SUBMITTED BY DEFENDANTS ULTA SALON, COSMETICS & FRAGRANCE, INC., LYNELLE P. KIRBY AND GREGG R. BODNAR

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

ARGUMENT ...................................................................................................... 7

I.  PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 ................................................ 7

    A.  Plaintiffs Fail To Plead An Actionable Misrepresentation Or Omission ............... 9

        1.  ULTA's Third Quarter SG&A Expenses And Inventory Levels ............... 9

            a.  The Prospectus Did Not Guarantee Any Future Results .............. 12

            b.  Forward-Looking Statements Regarding SG&A Expenses And Inventory Levels Were Not Materially False Or Misleading ............................................................................... 12

        2.  ULTA's New Warehouse Management Software ................................... 14

            a.  The Amended Complaint Alleges No Facts Establishing That ULTA's New Warehouse Management Software Had Any Impact – Let Alone A Material Impact – On Reported Financial Results In The Prospectus ........................................... 14

            b.  The Prospectus Bespoke Caution About ULTA's New Warehouse Management Software ....................................... 18

        3.  ULTA's High Growth Strategy And Its New Stores ................................. 20

    B.  Plaintiffs Fail To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter As Required By The PSLRA ............................................. 21

        1.  Plaintiffs' Conclusory Must Have Known Allegations Are Insufficient To Create A Strong Inference Of Scienter .......................... 22

        2.  Plaintiffs Plead No Logical Motive ....................................................... 23

        3.  Plaintiffs' Irrelevant Statements From Three Unreliable Confidential Witnesses Fail To Create A Strong Inference Of Scienter ........................................................................................... 25

II. THE SECTION 11 AND 12 CLAIMS FAIL AS A MATTER OF LAW ...................... 28

    A.  Plaintiffs' Section 11 And 12 Claims Do Not Satisfy Rule 9(b) .................. 28

    B.  Defendants Are Not Statutory Sellers Within The Meaning Of Section 12 .......... 31

    C.  Plaintiffs Do Not Have Standing To Sue Under Section 12 .................... 32

    D.  The Amended Complaint Does Not Establish Recoverable Damages Under Section 11 ................................................................................ 33

III. THE CONTROL PERSON CLAIMS FAIL AS A MATTER OF LAW ...................... 34

CONCLUSION .................................................................................................. 34

i

## TABLE OF AUTHORITIES

Page

### CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008)..................................................................... 28

*Ackerman v. Nw. Mut. Life Ins. Co.*,
  172 F.3d 467 (7th Cir. 1999) ..................................................................... 8

*Albany Bank & Trust Co. v. Exxon Mobil Corp.*,
  310 F.3d 969 (7th Cir. 2002) ..................................................................... 4

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) ................................................................... 33

*Anderson v. Abbott Labs.*,
  140 F. Supp. 2d 894 (N.D. Ill. 2001)....................................................... 12

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
  505 F. Supp. 2d 662 (D. Colo. 2007) ....................................................... 24

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................... 17, 20

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007)......................................................................... 30, 33

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) ................................................................................... 8

*CALPERS v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ............................................................... 15, 28

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*,
  114 F. Supp. 2d 316 (D.N.J. 2000).......................................................... 30

*Central Laborers' Pension Fund v. SIRVA, Inc.*,
  No. 04-7644, 2006 WL 2787520 (N.D. Ill. Sept. 22, 2006)..................... 23

*Chu v. Sabratek Corp.*,
  100 F. Supp. 2d 815 (N.D. Ill. 2000)......................................................... 8

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
  388 F. Supp. 2d 932 (S.D. Ind. 2005) ................................................. 15, 18

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
  No. 99-12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001).................... 31

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005)....................................................... 23

*Davis v. SPSS, Inc.*,
  431 F. Supp. 2d 823 (N.D. Ill. 2006)....................................................... 15

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) ............................................................... 10, 20

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) ................................................................... 10

*Eisenstadt v. Centel Corp.*,
    113 F.3d 738 (7th Cir. 1997) ................................................................ 14

*Friedman v. Rayovac Corp.*,
    295 F. Supp. 2d 957 (W.D. Wisc. 2003) ................................................ 28

*Fugman v. Aprogenex, Inc.*,
    961 F. Supp. 1190 (N.D. Ill. 1997) ...................................................... 13

*Gallagher v. Abbott Labs.*,
    269 F.3d 806 (7th Cir. 2001) .......................................................... 11, 20

*Gart v. Electroscope, Inc.*,
    24 F. Supp. 2d 969 (D. Minn. 1998) ...................................................... 10

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996) ............................................................ 10, 11

*Griffin v. PaineWebber, Inc.*,
    No. 99-2292, 2001 WL 740764 (S.D.N.Y. June 29, 2001) ...................... 33

*Grimes v. Navigant Consulting, Inc.*,
    185 F. Supp. 2d 906 (N.D. Ill. 2002) ..................................................... 5

*Gustafson v. Alloyd Co., Inc.*,
    513 U.S. 561 (1995) ........................................................................ 32

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ..................................................... 16, 21, 22

*In re Adecco S.A. Sec. Litig.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006) ............................................. 25, 26

*In re AOL Time Warner, Inc. Sec. Litig. & ERISA Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) .................................................. 34

*In re Bally Total Fitness Sec. Litig.*,
    No. 04-3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ...................... 21

*In re Bally Total Fitness Sec. Litig.*,
    No. 04-3530, 2007 WL 551574 (N.D. Ill. Feb. 20, 2007) ....................... 15

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ............................................................ 12

*In re Career Educ. Corp. Sec. Litig.*,
    No. 03-8884, 2007 WL 1029092 (N.D. Ill. Mar. 29, 2007) ............ 18, 22, 26

*In re Deutsche Telekom AG Sec. Litig.*,
    No. 00-9475, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ...................... 31

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993) ................................................................. 19

*In re First Merch. Acceptance Corp. Sec. Litig.*,
    No. 97-2715, 1998 WL 781118 (N.D. Ill. Nov. 2, 1998) ........................ 28

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004) .................................................. 11

*In re Guidant Corp. Sec. Litig.*,
    536 F. Supp. 2d 913 (S.D. Ind. 2008) .................................................. 22

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................ 18, 23

*In re K-tel Int'l Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) .......................................................................................... 24

*In re Metricom Sec. Litig.*,
    No. 01-4085, 2004 WL 966291 (N.D. Cal. Apr. 29, 2004) ...................................... 29

*In re Midway Games, Inc. Sec. Litig.*,
    332 F. Supp. 2d 1152 (N.D. Ill. 2004) .................................................................... 17, 18

*In re Mut. Funds Inv. Litig.*,
    437 F. Supp. 2d 444 (D. Md. 2006) .............................................................................. 23

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) .......................................................................... 25

*In re N2K Inc. Sec. Litig.*,
    82 F. Supp. 2d 204 (S.D.N.Y. 1999) ............................................................................ 20

*In re SeaChange Int'l, Inc. Sec. Litig.*,
    No. 02-12116, 2004 WL 240317 (D. Mass. Feb. 6, 2004) .................................. 10, 30

*In re Stac Elec. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) .......................................................................................... 28

*In re Sterling Foster & Co., Inc. Sec. Litig.*,
    222 F. Supp. 2d 216 (E.D.N.Y. 2002) .......................................................................... 33

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    202 F. Supp. 2d 8 (S.D.N.Y. 2001) .............................................................................. 10

*Lone Star Ladies Inv. Club v. Scholtzky's, Inc.*,
    238 F.3d 363 (5th Cir. 2001) .................................................................................. 28, 32

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) .......................................................................... 27

*Modell v. Eliot Sav. Bank*,
    139 F.R.D. 17 (D. Mass. 1991) ...................................................................................... 32

*Ong v. Sears, Roebuck & Co.*,
    No. 03-4142, 2005 WL 2284285 (N.D. Ill. Sept. 14, 2005) ................................ 32, 33

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ........................................................................................................ 31

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ................................................................ 7, 21, 22, 24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .................................................................................. 28, 29

*Roots P'Ship v. Lands' End, Inc.*,
    965 F.2d 1411 (7th Cir. 1992) ...................................................................................... 13

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ........................................................................................ 31

*Roth v. OfficeMax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) .......................................................................... 23

*Sears v. Liken,*
   912 F.2d 889 (7th Cir. 1990) .................................................................. 28

*Stark Trading & Shepherd Inv. Int'l, Ltd. v. Falconbridge Ltd.,*
   No. 05-1167, 2008 WL 153542 (E.D. Wisc. Jan. 14, 2008) ................... 33

*Stavros v. Exelon Corp.,*
   266 F.Supp. 2d 833 (N.D. Ill. 2003) ................................................. 4, 19

*Steinberg v. PRT Group, Inc.,*
   88 F. Supp. 2d 294 (S.D.N.Y. 2000) ....................................................... 34

*Tabankin v. Kemper Short-Term Global Income Fund,*
   No. 93-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994) .......................... 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   127 S. Ct. 2499 (2007) ......................................................................... 1, 8

*Wagner v. First Horizon Pharm. Corp.,*
   464 F.3d 1273 (11th Cir. 2006) ........................................................ 28, 29

*Wielgos v. Commonwealth Edison Co.,*
   892 F.2d 509 (7th Cir. 1989) ............................................................ 14, 17

*Zucker v. Quasha,*
   891 F. Supp. 1010 (D.N.J. 1995) ..................................................... 10, 30

## STATUTES

15 U.S.C. § 77-2 ..................................................................................... 13

15 U.S.C. § 77k ................................................................................. 28, 33

15 U.S.C. § 77l ................................................................................. 28, 31

15 U.S.C. § 78u-4 ................................................................................... 32

15 U.S.C. § 78u-5 ................................................................................... 13

Private Securities Litigation Reform Act .......................................... passim

Securities Act of 1933, § 11 ............................................................. passim

Securities Act of 1933, § 12 ............................................................. passim

Securities Act of 1933, § 15 ..................................................... 2, 4, 7, 34

Securities Exchange Act of 1934, § 10(b) ....................................... passim

Securities Exchange Act of 1934, § 20(a) ................................. 2, 4, 7, 34

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 104-369 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730 ........................... 8

S. Rep. No. 104-98 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679 .......................................... 8

## RULES

Fed. R. Civ. P. 23 ................................................................................... 32

Fed. R. Civ. P. 8 ..................................................................................... 30

Fed. R. Civ. P. 9 .............................................................................. passim

## REGULATIONS

12 C.F.R. § 16.2 .................................................................................................. 5

17 C.F.R. § 230.175 ................................................................................. 13, 14, 19

17 C.F.R. § 240.3b-6 ............................................................................................ 13

Defendants Ulta Salon, Cosmetics & Fragrance, Inc. ("ULTA"), Lynelle P. Kirby and Gregg. R. Bodnar submit this Memorandum In Support Of The Motion To Dismiss The Amended Complaint with prejudice.

## INTRODUCTION

This is no ordinary federal securities fraud complaint. To the contrary, this case has none of the traditional factors typically alleged in securities fraud lawsuits. Plaintiffs present no allegation of "cooked" books, GAAP violations, insider trading or restatement of financial results; the Amended Complaint does not even allege that any financial result for any financial period was false. There has only been an initial public offering ("IPO"), a post-IPO run-up in stock price, followed shortly thereafter by a steady drop in stock price, which continued when ULTA announced its third quarter results and persisted after plaintiffs filed suit. Having seen this drop, plaintiffs opportunistically filed suit with the hopes of using the federal securities laws as a down-side insurance plan to recoup their losses after the exuberance of the IPO. Their effort is misplaced. The Amended Complaint rests on nothing more than hindsight, speculation and illogic, requiring its dismissal before further abuse ensues. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007) ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law.)

ULTA, a high-growth beauty retailer, decided to publicly market its common stock in 2007. Its stock was offered to the public on October 25, 2007 at $18.00 per share in a firm commitment underwriting pursuant to a written Prospectus. The IPO took place before the end of ULTA's third quarter for fiscal year 2007,[1] and the Prospectus included historical financial

---

[1]    ULTA's fiscal year 2007 ended February 2, 2008.

statements through ULTA's second quarter, which ended August 4, 2007. The stock immediately began trading above $18.00, closing that first day of trading at $29.82 per share. After rising as high as $35.63 per share, ULTA stock began a steady decline that continued for the most part through the ensuing weeks.

On December 11, 2007, ULTA timely disclosed its third quarter financial results and provided the market with guidance on the upcoming fourth quarter. Following this announcement, ULTA's stock price continued to trend downward. Six days later, the first of three plaintiffs took the occasion of this drop in stock price following the Company's earnings announcement as an opportunity to file a complaint giving rise to this shareholder class action. After the three suits were consolidated, plaintiffs filed their Amended Complaint, alleging defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Sections 11, 12 and 15 of the Securities Act of 1933. The Amended Complaint fails to state a cause of action under any of the statutes asserted.

Plaintiffs' Section 10(b) claim fails for two reasons. First, the Amended Complaint fails to identify *any* actionable misrepresentation or omission in the Prospectus. In fact, plaintiffs do not even allege that any historic financial information in the Prospectus was incorrect, but suggest instead that ULTA should have disclosed its budgets and projections for the third quarter, *even though the third quarter was not yet complete* when the Prospectus was issued. Plaintiffs' theory that ULTA was somehow obligated to disclose financial data for a quarter that is not yet complete is contrary to law and logic. There is no requirement that a company disclose incomplete financial information or internal projections, which are quintessential "forward looking statements." ULTA had no obligation to make such disclosures, particularly where, as here, the Prospectus contained clear risk disclosures covering the very issues that plaintiffs now

assert were not disclosed. Therefore, these so-called "omissions" cannot form the basis of a securities fraud claim.

Second, plaintiffs' claim of securities fraud fails under the stringent requirement of the Private Securities Litigation Reform Act ("PSLRA") that they plead particularized facts creating a "*strong inference*" that each defendant acted with the requisite intent to defraud. Rather than plead such facts, plaintiffs settle for unsupported innuendo that ULTA's CEO and CFO "must have known" by virtue of their positions in the Company about the third quarter results, which were not complete when the Prospectus was issued. Illogical as this theory is, it is doubly so where the only *motive* plaintiffs allege defendants would have had to intentionally omit information from the Prospectus is to increase the price of the post-IPO stock, even though these defendants were themselves ***barred*** from profiting from any such scheme. As the Prospectus itself discloses, neither Kirby nor Bodnar could sell any of their stock for 180 days after the IPO, months after ULTA timely reported its quarterly results in its Form 10-Q.

Plaintiffs' Section 11 and 12 claims are doomed for similar reasons. First, absent an actionable omission, the Section 11 and 12 claims fail. Second, defendants are not "statutory sellers" within the scope of Section 12 and therefore cannot be liable under Section 12. Issuers in a firm commitment underwriting – where shares are sold to the public by underwriters, not issuer – are not subject to Section 12 unless the issuer took specific steps to "solicit" plaintiffs' stock purchases. No such solicitation is alleged here. Third, plaintiffs lack standing under Section 12 because they fail to allege plausible grounds that they purchased their shares directly in the IPO. Fourth and finally, ULTA stock opened at $18.60 on the day plaintiffs first filed suit. This is 60 cents per share *higher* than the offering price. Thus, plaintiffs have failed to allege

that they have suffered any injury under Section 11.[2]

**BACKGROUND**[3]

*The Defendants.*  ULTA, a Delaware corporation, has its corporate headquarters in Illinois and retail stores across the country.  *See* Prospectus (Ex. 1) at 4.[4]  At all relevant times to this litigation, Kirby served as ULTA's CEO and Bodnar as CFO.  AC ¶¶22-23.

*The Company.*  ULTA was founded in 1990 as a discount beauty supply retailer.  In 1999, the Company pioneered a new approach to beauty retailing and began offering one-stop shopping for prestige, mass, salon-quality products, and salon services.  *See* Prospectus (Ex. 1) at 10.  ULTA couples its unique sales approach with a high-growth strategy.  *Id.*  From fiscal 1999 to fiscal 2006, the Company's square footage grew at a compounded annual rate of 16%, culminating in 211 stores across 26 states by August 4, 2007.  *Id.*  ULTA continues to add new stores, opening 31 new stores in fiscal 2006 and 53 new stores in fiscal 2007.  *Id.*  The Company expects to grow to over one thousand stores within ten years.  *Id.*

*The IPO.*  When ULTA decided to go public, it did so on a firm commitment basis.  Under this arrangement, five underwriters bought ULTA's common stock and agreed to be fully responsible for further sales to the public.  *Id.* at 113.  The SEC declared the ULTA Registration

---

[2]     Plaintiffs' Section 15 and 20(a) "control person" claims require plaintiffs to plead an underlying securities law violation.  In the absence of a well-pleaded claim under Sections 10(b), 11 or 12, these claims fail as well.

[3]     This Court may take judicial notice of documents publicly filed with the SEC, *see Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 844 n. 8 (N.D. Ill. 2003), and of any "documents that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim," *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002).

[4]     Documents referenced as "Ex." appear as exhibits to the Declaration of Sean M. Berkowitz in Support of the Motion to Dismiss the Amended Complaint, attached hereto.

4

Statement effective on October 24, 2007,[5] and ULTA and its underwriters announced that

approximately 8.5 million shares of common stock would be offered at $18.00 per share. The

stock began trading publicly on the NASDAQ on October 25, 2007; the underwriters delivered

the stock to purchasers on October 30, 2007. *Id.* at 1.

   *The Price of ULTA Common Stock.* [6] After opening at $18.00, heavy trading brought the

price to a close of $29.82 that first day. *See* Price Chart (Ex. 2). The price peaked at $35.63 on

October 31, 2007, and declined steadily over the next several weeks, closing at $29.04 on

November 12, 2007, and $23.87 on November 27, 2007. *Id.* The stock rebounded briefly in the

days leading up to the December 11, 2007 announcement of fourth quarter guidance and third

quarter results, and closed at $27.50 on December 10, 2007. *Id.* After the announcement, the

stock price remained above the offering price, closing at $20.91 on December 11, 2007. *Id.* The

stock first fell below the $18.00 offering price after plaintiffs filed suit December 17, 2007. *Id.*

   *ULTA Announces Its Third Quarter Results.* Nine days after the IPO, November 3, 2007,

ULTA's third quarter for fiscal 2007 ended. On December 11, 2007, ULTA reported its third

quarter results. By all measures ULTA enjoyed a successful third quarter; both net sales and net

income increased from the prior year's third quarter. *See* 12/11/07 ULTA 8-K (Ex. 3) at 1.

Operating measures proved consistent with the prior year's quarter:

- SG&A expenses for the third quarter were $55.6 million, or 26.7% of net sales,
  compared to $40.8 million, or 24.6% of net sales, for the prior third quarter; and

- Merchandise inventories were $219.5 million, an increase of $62.7 million compared
  to the prior third quarter, $15 million due to a calendar shift bringing the third quarter

---

[5]    Because the ULTA Registration Statement incorporated the Prospectus, this Memorandum refers
only to the Prospectus for ease of reference. *See* 12 C.F.R. § 16.2(m) (A registration statement is a "filing
that includes the Prospectus . . . .").

[6]    Judicial notice of stock prices is appropriate when adjudicating a motion to dismiss. *See Grimes
v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 913 (N.D. Ill. 2002). ULTA's historic stock prices are
publicly available at http://finance.yahoo.com/q?s=ULTA.

closer to the holiday season and approximately $42.7 million due to the addition of 49 new stores since the prior third quarter.

*Id.* at 3. ULTA also introduced guidance for its upcoming fourth quarter, providing investors with its expected range of net sales and net income for the fourth quarter of fiscal 2007. *See id.* at 3-4. The timely filing of ULTA's Form 10-Q followed on December 13, 2007, further elaborating on these matters. *See* 12/13/07 ULTA 10-Q (Ex. 4).

The announcement of third quarter results discussed many aspects of ULTA's business, the industry, and the general economy. As for ULTA's SG&A expenses and inventory levels – the only items of concern identified by plaintiffs – third quarter results were consistent with past results and the Company's high growth strategy. Third quarter SG&A expenses as a percentage of net sales was 26.7%, consistent with the upward trend of SG&A expenses appearing in the Prospectus. *See* Prospectus (Ex. 1) at 43 (SG&A as a percentage of net sales for the second quarter of 2007 was 25.5%, compared to 24.4% for the second quarter of 2006). Increased merchandise inventories arose naturally, as they did for other retailers, due to a calendar shift bringing the end of the third quarter closer to the holiday season than the prior third quarter – a period during which retailers are expected to carry increased inventory. *See* 12/11/07 ULTA 8-K (Ex. 3) at 3. ULTA also was required to carry additional inventory for the 49 new stores not in existence during the prior year's third quarter.[7] *Id.* The increased inventory levels caused by the opening of these new stores was entirely consistent with the high growth strategy ULTA disclosed in its Prospectus. The increased inventory caused by these two factors accounted for 92% of the inventory increase of which plaintiffs now complain.

*Plaintiffs.* When the price of ULTA common stock continued its multi-week decline following the IPO, Marc Mirsky filed suit on December 17, 2007, alleging violations of Sections

---

[7]    26 new stores opened in the third quarter of 2007. *See* 12/11/07 ULTA 8-K (Ex. 3) at 4.

11, 12, and 15 of the Securities Act of 1933. The original complaint did *not* include any claims of securities fraud under Section 10(b) and 20(a) of the Securities Exchange Act of 1934. Two copycat complaints followed soon after, adding these claims of securities fraud. The three actions were eventually consolidated and lead plaintiffs were appointed.

　　*The Amended Complaint.* Plaintiffs filed the Amended Complaint on May 19, 2008, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act and Sections 11, 12, and 15 of the Securities Act. Stripped of repetition and rhetoric, the Amended Complaint asserts the Prospectus was materially false and misleading because it lacked any financial data for the still-incomplete third quarter, which would not close until nine days after the IPO, and that defendants knowingly withheld this information.

**ARGUMENT**

**I.   PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934**

　　To withstand dismissal, plaintiffs must adequately plead each of the six elements of a claim for securities fraud under Section 10(b): (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of stock; (4) reliance; (5) economic loss; and (6) loss causation. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). As with all fraud claims, these elements must be pleaded in compliance with FEDERAL RULE OF CIVIL PROCEDURE 9(b), which requires the "circumstances constituting fraud or mistake [to be] stated with particularity." Fed. R. Civ. P. 9(b). This particularity requirement – no technical hurdle – ensures plaintiffs "conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate."[8] *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467,

---

[8]　　Unless otherwise indicated, emphasis in quotations is added and internal citations are omitted.

7

469 (7th Cir. 1999).

These appropriately heightened standards are designed to address the very real concern that plaintiffs, such as the ones here, file frivolous lawsuits whenever a company's stock price drops in the hopes of forcing a company to settle rather than engage in costly litigation. *See Tellabs*, 127 S. Ct. at 2504 ("if not adequately contained, [securities lawsuits] can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law").[9] Because Congress concluded that Rule 9(b) had "not prevented abuse of the securities laws by private litigants," H.R. Conf. Rep. No. 104-369, at 41 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 740, Congress enacted the PSLRA to further guard against securities fraud suits "based on nothing more than a company's announcement of bad news, not evidence of fraud," S. Rep. No. 104-98, at 4 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 683. The PSLRA "imposes a stricter pleading standard than that imposed by Rule 9(b)." *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000).

Under the PSLRA's heightened requirements, a complaint must (1) identify each statement alleged to have been misleading, (2) state the reasons why each statement is misleading, (3) identify *particularized facts* to establish the basis for plaintiffs' belief that each statement was false or misleading when made, and (4) "state with particularity facts giving rise to a *strong inference*" that *each* defendant engaged in conscious or reckless misconduct so severe that it was the *functional* equivalent of intent. 15 U.S.C. § 78u-4(b)(1) & (2); *see Tellabs*, 127 S. Ct. at 2504. Where, as here, plaintiffs fail to plead facts sufficient to meet their burden on any element, the complaint "*shall*" be dismissed. 15 U.S.C. § 78u-4(b)(3); *see Taubenfeld v. Career*

---

[9]    *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975) (Discovery in securities litigation "permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence . . . .").

*Education Corp.*, No. 03-8884, 2005 WL 350339, at *2 (N.D. Ill. Feb. 11, 2005) ("If the

complaint fails to meet th[e] [heightened pleading] requirement under the PSLRA, the court

shall, on a motion of any defendant, dismiss the complaint.").

As described more fully below, the Amended Complaint fails to satisfy the exacting

standards of Rule 9(b) and the PSLRA in at least two respects:  (1) it fails to identify any

materially misleading representations or omissions, and (2) it fails to plead particularized facts

giving rise to the requisite strong inference – or any inference at all – of scienter.

### A.    Plaintiffs Fail To Plead An Actionable Misrepresentation Or Omission

Nowhere does the Amended Complaint even attempt to allege that the Prospectus

contained an actionable misrepresentation.  Plaintiffs instead claim that the Prospectus *omitted*

material information, specifically that ULTA should have, but did not, disclose sufficient detail

concerning three matters:  (1) projected inventory levels and SG&A expenses for the not-yet-

completed third quarter; (2) the impact of a new warehouse management software on those

projected third quarter inventory levels; and (3) projected third quarter store growth.  None of

these alleged "omissions" is actionable, for the reasons discussed below.

### 1.    ULTA's Third Quarter SG&A Expenses And Inventory Levels

The gravamen of plaintiffs' fraud claim is that ULTA allegedly "timed" its IPO so as to

avoid disclosure of its financial figures – particularly SG&A expenses and inventory levels – for

the incomplete third quarter of fiscal 2007.  *See* AC ¶25.  Rather than base this claim on facts,

plaintiffs rely on pure speculation.  The Amended Complaint fails to plead with particularity ***any***

facts suggesting (much less establishing) that ULTA had final calculations of third quarter

SG&A expenses and inventory levels for the pending fiscal quarter at the time of the IPO.

Indeed, because the quarter was ***not yet over*** and there remained nine more days before such

numbers could be calculated, it is *pure speculation* for plaintiffs to conclude that such finalized

quarter-ending numbers existed at the time of the IPO.  The Amended Complaint nowhere

alleges (1) *how* ULTA would have compiled its final third quarter SG&A expenses and

inventory levels before the quarter even ended, (2) *who* compiled and subsequently withheld

these numbers, (3) *when* these numbers became available to defendants, and (4) *what* the

numbers said about third quarter SG&A expenses and inventory levels as of the time of the IPO.

*See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (Rule 9(b) requires the "who,

what, when, where, and how:  the first paragraph of any newspaper story.").

For exactly these reasons, courts reject the argument that a prospectus must disclose

financial data for a pending fiscal quarter.  For example, in *Gart v. Electroscope, Inc.*, 24 F.

Supp. 2d 969 (D. Minn. 1998), plaintiffs argued that a prospectus was misleading when it

omitted information for the fiscal quarter that ended three days after an IPO, *id.* at 974.  The

court rejected this argument:  "The complaint is totally devoid of any allegations that Defendants

knew of, had reason to know of, or possessed any quarter-in-progress information that was not

disclosed in the Prospectus."  *Id.*; *accord In re SeaChange Int'l, Inc. Sec. Litig.*, No. 02-12116,

2004 WL 240317, at *16 (D. Mass. Feb. 6, 2004) ("Plaintiffs allege no facts to support their

contention that [financial results] were in fact eroding at the time of the Offering . . . .").[10]

Contrary to this well-settled and logical rule of law, plaintiffs simply work backwards

---

[10]     *See also DeMaria v. Andersen*, 318 F.3d 170, 181 (2d Cir. 2003) (securities lawsuit dismissed where company disclosed first quarter results eleven days after IPO); *Glassman v. Computervision Corp.*, 90 F.3d 617, 632 (1st Cir. 1996) ("That quarterly results . . . did in fact turn out to be lower than expected is not enough to produce the inference that as of the offering date [the company] had hard mid-quarter results that would have predicted a material departure in the end-of-quarter results"); *Zucker v. Quasha*, 891 F. Supp. 1010, 1016 (D.N.J. 1995) ("Regardless of whether a public offering occurs seventeen or only two days before the close of fiscal quarter, data concerning a quarter that is in progress is necessarily incomplete"); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (observing "reluctance of courts to require companies to release results before, or within days of, the end of fiscal quarters").

from ULTA's press release and Form 10-Q, published more than six weeks after the IPO, to allege that the state of affairs at that later time must have been the state of affairs at the time of the IPO. But nowhere does the Amended Complaint present any grounds to believe that finalized third quarter SG&A expenses and inventory levels were known to any defendant at the time of the IPO. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004) ("The truth of a statement made in the Prospectus is adjudged by the facts as they existed when the registration statement became effective."). For example, plaintiffs do not provide any allegation about any internal memorandum – dated before the effective date of the Prospectus, October 24, 2007 – that reported ULTA's finalized SG&A expenses and inventory levels to Kirby and Bodnar. *See id.* at 255 ("When a plaintiff claims that the defendant failed to disclose information in a prospectus, the plaintiff must plead facts demonstrating the defendant possessed the omitted information when the registration statement became effective and that the defendant had a duty to disclose that information."). Without any such allegation, the Amended Complaint fails to plead how statements in the Prospectus regarding SG&A expenses and inventory levels were misleading when made.

Moreover, contrary to plaintiffs' allegations, ULTA had no obligation to disclose projections or forecasts regarding third quarter results in the Prospectus. *See, e.g.*, AC ¶44(a) ("It was further materially misleading to not disclose that . . . SG&A expenses would rise 2.1% higher than in the third quarter of fiscal 2006"). The law "imposes no obligation upon an issuer to disclose . . . internal projections, estimates of future performance, forecast, budgets, and similar data." *Glassman*, 90 F.3d at 631; *see also Gallagher v. Abbott Labs.*, 269 F.3d 806, 811 (7th Cir. 2001). As a result, the Section 10(b) claim fails without any indication that the omitted information existed as of the IPO or that defendants had a duty to disclose the information.

### a.    The Prospectus Did Not Guarantee Any Future Results

Apparently conceding that ULTA could not disclose final results for a quarter that was not yet complete, plaintiffs attempt to suggest that historical financial statements appearing in the Prospectus – whose accuracy plaintiffs do not contest – impliedly guaranteed consistent results into the future. *See, e.g.*, AC ¶¶ 36, 38, 39, 44(a), 44(c), 45(c), 46. This assertion is inconsistent with the Prospectus and well-settled law.

Contrary to plaintiffs' assertion, the Prospectus dispelled any notion that an investor should rely on ULTA's past performance. *See, e.g.*, Prospectus (Ex. 1) at 20 ("[O]ur results for any one fiscal quarter are not necessarily indicative of the results to be expected for any other quarter . . . . In that event, the price of our common stock would likely decline"); *id.* at 42 ("Our quarterly results of operations have varied in the past and are likely to do so again in the future.... [P]eriod-to-period comparisons of our operations should not be relied upon as an indication of our future performance"). The Prospectus thus fully disclosed the risk behind relying on ULTA's past results as indicative of future results.

In any event, it is well-settled that "an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update the public as to the state of the quarter in progress." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997); *accord Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001). Accordingly, plaintiffs' entire theory of the case fails.

### b.    Forward-Looking Statements Regarding SG&A Expenses And Inventory Levels Were Not Materially False Or Misleading

Plaintiffs also contend a number of forward-looking statements were false and misleading without information about SG&A expenses and inventory levels for the pending fiscal quarter.

*See, e.g.*, AC ¶¶ 44(d), 44(e).  Such forward-looking statements cannot form the basis of liability because they are protected by the Rule 175 safe harbor.

Rule 175 provides a safe harbor for forward-looking statements "made in a registration statement filed under the [Securities] Act."[11]  17 C.F.R. § 230.175(b)(1)(i); *see also id.* § 240.3b-6(b)(1)(i).  Forward-looking statements include projections of revenue, capital expenditures, and "management's plans and objectives for future operations." *Id.* § 230.175(c).  Such statements are not false and misleading unless made "without a reasonable basis or . . . disclosed other than in good faith." *Id.* § 230.175(a).

Amounting to nothing more than ULTA's plans and objectives for the future, a number of the statements cited in the Amended Complaint are protected by the Rule 175 safe harbor.[12] *See, e.g.*, AC ¶44(d) ("we plan to continue to improve our operating results by . . . decreasing our selling, general, and administrative expenses, as a percentage of sales"); AC ¶44(e) ("[o]ur gross advertising budget over the next five years is decreasing as a percentage of sales").  As a result, to assert liability on the basis of these statements, plaintiffs must plead facts that indicate that ULTA lacked a reasonable basis for these statements and that these statements were disclosed other than in good faith. *See Roots P'Ship v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) ("In order to overcome the presumption that the statements fall within the Rule 175 safe harbor, [plaintiff] b[ears] the burden of pleading sufficient facts on both the 'reasonable basis'

---

[11]     In contrast to Rule 175, the PSLRA safe harbor does not apply to forward-looking statements "made in connection with an initial public offering." 15 U.S.C. § 77-2(b)(2)(D) & § 78u-5(b)(2)(D). Nonetheless, the PSLRA safe harbor does not supersede Rule 175: "Effect on other safe harbors.  The exemption provided for in paragraph (1) shall be in addition to any exemption that the Commission may establish . . . ." *Id.* § 77-2 (c)(4) & § 78u-5(c)(4) ); *see also Fugman v. Aprogenex, Inc.*, 961 F. Supp. 1190, 1196-98 (N.D. Ill. 1997).

[12]     The Complaint asserts that a number of statements of corporate optimism and puffery were false and misleading. *See, e.g.*, AC ¶45(b) (ULTA believes it had "developed a disciplined approach to buying and dynamic inventory planning").  Such loose statements of "optimistic rhetoric" are not actionable as a

and 'good faith' issues."); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 513-17 (7th Cir. 1989). With no such allegations appearing in the Amended Complaint, plaintiffs fail to state a claim thereon.[13]

### 2.     ULTA's New Warehouse Management Software

Plaintiffs allege the Prospectus did not disclose how ULTA's new and "ineffective" warehouse management software would affect third quarter inventory levels. AC ¶47. This contention suffers from an overarching flaw. Nowhere in the Amended Complaint do plaintiffs allege facts indicating that the new warehouse management software *actually had* any effect on third quarter 2007 inventory levels. Moreover, to the extent that ULTA's new software may have had an impact on third quarter inventory levels – an allegation supported by nothing more than sheer speculation – plaintiffs cannot assert any claim under the well-established "bespeaks caution" doctrine.

### a.     The Amended Complaint Alleges No Facts Establishing That ULTA's New Warehouse Management Software Had Any Impact – Let Alone A Material Impact – On Reported Financial Results In The Prospectus

Plaintiffs' attempt to blame ULTA's new warehouse management software for the increased third quarter inventory is rank speculation. The Amended Complaint provides nothing more than the grumblings of three low-level former employees who relay the difficulties they felt ULTA experienced during the implementation of its new software. Not one statement attributed to these former employees establishes that the issues they identified with the warehouse

---

matter of law. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) ("[S]ales puffery is not actionable").

[13]     Not only are the forward-looking statements protected by Rule 175, but meaningful cautionary language makes the omission of third quarter SG&A expenses and inventory levels immaterial as a matter of law under the "bespeaks caution" doctrine. *See, e.g.*, Prospectus at 10, 20, 35, 44; *see infra* at (I)(A)(2)(b).

management software *actually had any material impact on ULTA's reported third quarter inventory levels.*[14]

Courts in this Circuit and elsewhere repeatedly reject statements attributed to confidential witnesses who are not in a position to possess relevant, reliable information because:

- They are "low-level" employees who had no insight into how reporting decisions were made and were not privy to the same information available to those responsible for financial reporting;[15]

- They rely on "second or third-hand" information, rumor or innuendo;[16] and

- They cannot quantify the effect of alleged problems "on the company's national numbers, and hence on the company's public statements during the class period."[17]

All of these factors disqualify plaintiffs' confidential witnesses from establishing that ULTA's new warehouse management software was a material event requiring disclosure.

Former Employee 1 ("FE 1") allegedly worked in ULTA's warehouse.[18]  Plaintiffs do not

---

[14]    Plaintiffs' confidential witness statements relate *only* to alleged problems with the warehouse management software and any impact that might have had on inventory levels.  These witnesses have *nothing* to say about any of the other alleged "omissions" – such as those related to SG&A expenses or store growth – or any defendant's knowledge thereof.

[15]    *CALPERS v. Chubb Corp.*, 394 F.3d 126, 146-47 (3d Cir. 2004) (rejecting statements attributed to "low-level" former employees); *In re Bally Total Fitness Sec. Litig.*, No. 04-3530, 2007 WL 551574, at *7 (N.D. Ill. Feb. 20, 2007) ("*Bally II*") (same).

[16]    *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831 (N.D. Ill. 2006) ("*Davis II*") ("[A]ny information witnesses received second- or third-hand is insufficient to establish its reliability").

[17]    *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 944 (S.D. Ind. 2005); *accord Bally II*, 2007 WL 551574, at *7 ("Even if . . . allegations were reliable, [witness] is unable to provide any information about what relevance the purported scheme had to what Bally ultimately reported on its financial statements."); *Davis II*, 431 F. Supp. 2d at 832 (same).

[18]    Defendants assume for present purposes that the identities and statements attributed to plaintiffs' confidential former employees are accurate.  The Seventh Circuit has held, however, that such confidential witness allegations should be steeply discounted:

Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist. . . . *Tellabs* requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences; anonymity frustrates that process. . . . *Tellabs* instructs courts to evaluate the allegations in their entirety, we said above that allegations from "confidential witnesses" must be "discounted" rather than ignored.  Usually that discount will be steep.

allege that FE 1 had any responsibility for financial reporting or any insight into whether or how the warehouse management software impacted ULTA's publicly reported inventory levels in any reporting period. Moreover, FE 1 is not alleged to have had any reporting relationship to Kirby, Bodnar, or any other officer responsible for statements appearing in the Prospectus. AC ¶93(a).

Former Employee 2 ("FE 2") was an inventory analyst at ULTA. Like FE 1, FE 2 is not alleged to have any responsibility for, or understanding of, financial reporting in any of ULTA's SEC filings, or the impact of inventory on those filings. FE 2 is not alleged to have worked in ULTA's headquarters or to have reported to Kirby, Bodnar, or anyone else responsible for financial reporting. AC ¶93(b).

Former Employee 3 ("FE 3") worked in the warehouse with FE 1 and at various times during 2006 visited ULTA to serve as "one of approximately 20 'testers'" who helped "test the effectiveness of the new SAP-based WMS." Like the others, FE 3 is not alleged to have had any personal involvement with the reporting of inventory in the Prospectus or to have reported to Kirby, Bodnar, or anyone that did. *Id.* at ¶93(c)(iii).

Given their low-level positions and their lack of access to financial reporting, these former employees do not support plaintiffs' allegation that the new warehouse management software had any effect, let alone a material effect, on third quarter inventory levels. At best, their positions may have given them a glimpse at difficulties in implementing the new warehouse management software. But not one was in a position to know – and not one claims to know – what, *if any,* impact the supposed problems with the warehouse management software had on ULTA's reported financial figures.

Nor are their statements corroborated by documents. References to internal reports are so

---

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

vague as to be unhelpful. For example, one unspecified report "regularly reflected a significantly high rate of failure for virtually all system functions." AC ¶93(a)(v). Other inventory reports "discussed the inventory variance information as a result of the problems described [in the Amended Complaint]." AC ¶93(b)(iii). As to others, FE 3 baldly asserts that before the conversion to a new warehouse management software, "the Distro Reports were accurate," and that "the SAP-based WMS generated Distro Reports had regular and significant inaccuracies." AC ¶93(c)(ix).

Not one statement attributed to any former employee even attempts to provide any details regarding the contents of these internal reports. *See Bally II*, 2007 WL 551574, at *10 (dismissing complaint that alluded to internal reports, but failed to attach them or describe "the specific contents of the reports, their intended use. . . or how the statements affected [the company's] company-wide statements"). Not one former employee is alleged to have had any role in preparing or even *reviewing* any of these reports, much less in the context of financial reporting or the Prospectus. The Amended Complaint is devoid of information regarding what the alleged failures, variances or inaccuracies were or how, if at all, they impacted the Prospectus.

Furthermore, no weight is afforded to confidential witness allegations where, as here, such allegations do not provide a court with a quantifiable basis from which to determine the materiality of an alleged internal problem.[19] For example, in *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152 (N.D. Ill. 2004), the court dismissed a Section 10(b) claim where plaintiffs relied on confidential witnesses who contended that the company's "reserves for sales

---

[19]    An omission is material if there is a substantial likelihood that disclosure of the omitted fact would significantly alter the total mix of information available to a reasonable investor. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Materiality is based on both the probability and magnitude of an effect. *See Wielgos*, 892 F.2d at 517.

returns were out of whack," and the process of computing reserves was akin to "throwing a dart at a board." *Id.* at 1169. The court dismissed the complaint because the "[p]laintiffs have alleged neither the amount of the alleged overstatement of revenues due to reserve accounting or the net effect it had on the company's earnings." *Id.*; *see also In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161 (C.D. Cal. 2007) ("In the absence of any allegations quantifying the financial impact . . . Plaintiff has failed to allege enough to allow a court to discern whether the alleged violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue."); *accord In re Career Educ. Corp. Sec. Litig.*, No. 03-8884, 2007 WL 1029092, at *2 (N.D. Ill. Mar. 29, 2007) (confidential witnesses did not cure defective allegations regarding "when and to what extent any misconduct occurred" and "did not show that the misconduct had any effect on [the company's] public statements"); *City of Austin*, 388 F. Supp. 2d at 944 (same).

The same should be the case here. Plaintiffs substitute vague adjectives – "unwanted buildup of inventories," "numerous problems," "ballooning" inventories, "excess inventories," "pervasive" problems – for objective, quantifiable facts. AC ¶47(e). The Amended Complaint is thus devoid of facts that would allow one to glean the magnitude of any problems supposedly created by the new warehouse management software. As a result, plaintiffs' conclusory allegations regarding "ballooning" and "pervasive" problems do not suggest ULTA omitted any material information about its new warehouse management software.

### b.     The Prospectus Bespoke Caution About ULTA's New Warehouse Management Software

Further belying plaintiffs' contention that the Prospectus omitted any information about the new warehouse management software, the Prospectus discloses the Company's transition to a new warehouse management software, "bespeaks caution" about the risks posed by the

transition, and thus renders the asserted omission immaterial as a matter of law. Under the

bespeaks caution doctrine, "[t]he substantial disclosure of specific risks may render alleged

misrepresentations concerning soft information immaterial and thus nonactionable as securities

fraud." *Stavros*, 266 F. Supp. 2d at 842 n. 6. The bespeaks caution extends to omissions. *See,*

*e.g.*, *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1993) ("[T]he inclusion

of sufficient cautionary language in a Prospectus renders misrepresentations and omissions

contained therein nonactionable.").

In that section of the Prospectus entitled **RISK FACTORS**, ULTA provided a

comprehensive discussion of the risks faced by transitioning to a new warehouse management

software. For example:

- "If we are unable to successfully implement the expansion of our distribution infrastructure and upgrade of our information systems, the efficient flow of our merchandise could be disrupted";

- "Any significant . . . disruptions in our information systems . . . could drastically reduce our ability to receive and process orders and provide products and services to our stores";

- "Any interruption during the transition of our information systems . . . and the modification of our warehouse management system software could have a material adverse effect on our business, financial condition and results of operations"; and

- "Any material disruptions of our systems could disrupt our ability to track, record, and analyze the merchandise that we sell and could negatively impact our operations, shipment of goods, [and] ability to process financial information."

Prospectus (Ex. 1) at 10-11. Though the Amended Complaint ignores these risk disclosures,

each statement documents the risks ULTA could experience as it modified its software system

and the effects that any disruption could have on its business.[20] Far from mere boilerplate or

---

[20]    Not only does the bespeaks caution doctrine apply, but Rule 175 also provides a safe harbor to statements in the Prospectus regarding the new warehouse management software as statements of "management's plans and objectives for future operations." 17 C.F.R. § 230.175(c).

general disclaimers, these statements provided substantive and specifically tailored warnings to plaintiffs, and "do not paint an unrealistically optimistic picture of [ULTA's] future performance but instead bespeak caution." *DeMaria*, 318 F.3d at 181; *see also In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y. 1999) (The "prospectus is replete with warnings and explanations of risks associated with the company's past financial history and future expectations.").

### 3.     ULTA's High Growth Strategy And Its New Stores

Plaintiffs finally allege that ULTA "did not disclose in the Prospectus, including the MD&A, that ULTA had accelerated its rate of growth in the Fiscal Third Quarter compared to the rate of growth in the first two quarters of Fiscal 2007, the six months ended August 4, 2007." AC ¶37. Even if ULTA had a legal obligation to volunteer a comparison between its expected third quarter growth and growth in prior quarters – which it did not[21] – the Prospectus demonstrates that plaintiffs are *simply wrong*. ULTA had a total of 196 stores at the end of fiscal 2006 and a total of 211 by August 4, 2007. Prospectus (Ex. 1) at 56, 60. The Prospectus disclosed ULTA's intention to open more stores during fiscal 2007: "We opened 31 stores in fiscal 2006 and plan to open approximately 50 stores in fiscal 2007." *Id.* at 56. Having opened only 15 new stores by August 4, 2007, the Prospectus fully disclosed that ULTA expected to accelerate its store growth by opening 35 additional stores over the course of the third and fourth quarters. It thus came as no surprise when ULTA's Form 10-Q disclosed that 26 of the 35 remaining stores in the pipeline for 2007 opened during the third quarter. *See* 12/13/07 ULTA 10-Q (Ex. 4) at 18. The Prospectus fully – and accurately – disclosed ULTA's future growth

---

[21]     *See Basic*, 485 U.S. 224 at 239 n. 17 ("Silence, absent a duty to disclose, is not misleading"); *Gallagher*, 269 F.3d at 808 ("[F]irms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose.").

prospects as of the time of the IPO.

**B.     Plaintiffs Fail To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter As Required By The PSLRA**

Not only have plaintiffs not identified a material omission, their Amended Complaint fails for the independent reason that it does not plead a strong inference of scienter under the PSLRA. Scienter means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. Neither simple negligence nor inexcusable neglect will do. "What is required to be shown is an *extreme departure from the standards of ordinary care*." *In re Bally Total Fitness Sec. Litig.*, No. 04-3530, 2006 WL 3714708, at *7 (N.D. Ill. July 12, 2006) ("*Bally I*"). A complaint must allege facts from which "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Higginbotham*, 495 F.3d at 756. "In applying this standard, the court must take into account plausible opposing inferences" and "weigh the strength of plaintiff's inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Id.* This "strong inference" must be pled with respect to *each* individual defendant. *Pugh*, 521 F.3d at 693. Plaintiffs attempt to plead with particularity facts giving rise to a "strong inference" of scienter through (1) generalized allegations that Kirby and Bodnar "must have known" the Prospectus contained omissions when it was filed, (2) the irrational insinuation that Kirby and Bodnar were motivated to commit fraud in order to inflate the value of ULTA common stock when they could not, and did not, sell any stock, and (3) vague and irrelevant statements attributed to three unreliable confidential witnesses. These allegations do not form a strong inference of scienter under the PSLRA.

21

1.     **Plaintiffs' Conclusory Must Have Known Allegations Are Insufficient To Create A Strong Inference Of Scienter**

Plaintiffs plead no particularized facts showing that Bodnar or Kirby knew that any statement in the Prospectus was false at the time it was made.[22]  The Amended Complaint instead relies on hindsight speculation that they must have known based on their positions and responsibilities at ULTA.  *See* AC ¶¶81(a)-(c), 83.  It is well-established in this Circuit that "there is no 'fraud by hindsight.'"  *Higginbotham*, 495 F.3d at 760; *see also In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 932 (S.D. Ind. 2008) ("[W]ithout particularized allegations indicating *how* or *when* Defendants came to possess information about [alleged misrepresentations], [Plaintiffs' complaint] constitutes impermissible pleading of 'fraud by hindsight' – a practice which the PSLRA was enacted to end.").

Courts routinely dismiss these sorts of hindsight allegations because "[s]cienter . . . may not rest on the inference that defendants must have been aware of a misstatement based simply on their positions within the company."  *Career Educ. Corp.*, 2007 WL 1029092, at *8.  Nor is it sufficient to merely allege, as plaintiffs do, that Kirby and Bodnar through their positions had access to ULTA's internal and financial reports.  *Pugh*, 521 F.3d at 694 (dismissing "wholly conclusory" allegations that scienter can be drawn from defendants' access to allegedly fraudulent information).  As the Seventh Circuit has held, "[t]here is a big difference between knowing about [] reports . . . and knowing that the reports are false."  *Higginbotham*, 495 F.3d at 758; *accord Guidant*, 536 F. Supp. 2d at 932 (rejecting allegation that "Defendants, as 'core members of the senior management team' at [the company], were privy to proprietary

---

[22]     "A corporation may be held liable for statements by employees who have apparent authority to make them."  *Pugh*, 521 F.3d at 697.  However, when a "complaint fails to plead facts sufficient to support a strong inference of scienter on the part of any of the . . . individual defendants, [the company's] scienter cannot be based on their state of mind."  *Id.*  Because plaintiffs do not plead a strong inference of scienter on the part of Kirby or Bodnar, they cannot establish corporate scienter for ULTA.

information about [the company's] growth and financial condition, had direct involvement in day-to-day operations, and controlled the dissemination of information by the company"); *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 798 (N.D. Ill. 2007) (rejecting allegations that "Defendants were knowledgeable about and involved in all aspects of the Company's financial performance").  Plaintiffs here have done nothing more than this.[23]  Accordingly, plaintiffs' "must have known" allegations cannot support a strong inference of scienter.

### 2.    Plaintiffs Plead No Logical Motive

Plaintiffs' attempts to plead scienter are further undermined by their failure to allege any logical motive for Kirby or Bodnar to commit securities fraud.  Plaintiffs' *only* "motive" allegations are passing references to the fact that "Kirby and Bodnar each stood to gain financially by the completion of the IPO in terms of stock ownership and the vesting of stock options in a now-publicly traded company."  AC ¶52.  These conclusory allegations are insufficient to establish any, let alone a strong, inference of scienter.

A financial motive to obtain a higher offering price in an IPO has no bearing on scienter. "Every shareholder in a company that decides to go public has a financial interest in obtaining a high offering price.  Equating that interest with an intent to defraud would make all such shareholders targets of securities fraud claims."  *Central Laborers' Pension Fund v. SIRVA, Inc.*, No. 04-7644, 2006 WL 2787520, at *16 (N.D. Ill. Sept. 22, 2006); *see also Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005) ("*Davis I*") ("The desire to increase the value of a company and attain the benefits that result . . . are basic motivations not only of fraud, but of

---

[23]    Similarly, plaintiffs suggest that the mere signing of a public filing such as the Prospectus, without any showing that Kirby and Bodnar knew statements contained therein to be false, has a bearing on scienter.  Not so.  *See, e.g., In re Mut. Funds Inv. Litig.*, 437 F. Supp. 2d 444, 447 (D. Md. 2006) (holding defendants' signatures on registration statement and prospectus insufficient to establish scienter); *Hansen*, 527 F. Supp. 2d at 1150 ("The Individual Defendants signatures on [the company's] public filings do not give rise to a strong inference of scienter."); *see also Roth*, 527 F. Supp. 2d at 803 (holding SEC certification "insufficient to support a strong inference of scienter").

running a successful corporation. Were courts to accept these motives as sufficient . . . the heightened pleading requirements for these claims would be meaningless.").

Plaintiffs' allegations are even more implausible because Kirby and Bodnar could not sell their ULTA stock before the December 11, 2007 announcement. As described in the Prospectus, both are subject to lock-up periods of *at least 180 days* following the IPO that prevent them from selling or otherwise disposing of their stock and stock options. *See* Prospectus (Ex. 1) at 115. It defies logic to suggest that Kirby and Bodnar would commit securities fraud in order to inflate ULTA's stock price, knowing full well that the "truth" would be reported months before they could reap any profit.

Not surprisingly, plaintiffs do not – and, of course, cannot – allege that Kirby and Bodnar tried to capitalize on their alleged fraud before filing ULTA's Form 10-Q. It would make no sense for either to engage in a fraud to inflate ULTA's stock price and then not try to profit from it through the sale of stock. *See, e.g., Higginbotham*, 495 F.3d at 759 ("One possible inference [from] the absence of sales by other managers who would have been in the know . . . implies that nothing was thought to be out of the ordinary . . . the absence of any demonstration that [the period in question] was an unusual period for managerial sales means that the complaint lacks the required 'strong' demonstration of scienter.'"); *Pugh*, 521 F.3d at 695 (that "defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of the company's stock fell"). The absence of open market stock sales by Kirby and Bodnar, the CEO and CFO, respectively, thus negates any inference of scienter.[24]

---

[24]    *See, e.g., In re K-tel Int'l Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) (dismissing complaint where president and CEO did not sell stock during the class period because "evidence that the individual defendants abstained from trading may undercut allegations of motive"); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 678 (D. Colo. 2007) (Dismissal of a complaint is proper where the "Plaintiff does not allege inside stock sales intended to take advantage of [the company's] purportedly intentional inflation of earnings. It is just such stock sales which courts most often rely upon in finding a strong inference of scienter."); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462

### 3.    Plaintiffs' Irrelevant Statements From Three Unreliable Confidential Witnesses Fail To Create A Strong Inference Of Scienter

Plaintiffs' sole attempt to allege any *contemporaneous* evidence of Kirby and Bodnar's state of mind consists of irrelevant statements attributed to three low-level former employees related solely to the new warehouse management software – and not SG&A expenses, new store growth or any other alleged misrepresentation or omission.  Just as those former employees were not in a position to testify about the impact, if any, of supposed problems the warehouse management software had on ULTA's reported financial figures, so too they provide no information as to whether any of the defendants knew that the Prospectus supposedly suffered from material omissions in this regard.  These witnesses offer nothing but speculation and irrelevant anecdotes that do nothing to impute any knowledge or recklessness to Kirby and Bodnar.

To be helpful, a confidential witness must be able to testify first-hand about not only the events at issue, but also defendants' knowledge of those issues.  *See, e.g., Bally II*, 2007 WL 551574, at *8, *10 (no weight given to confidential witness who "does not give any details about the locations or dates of the meetings he attended, who was in attendance or what was discussed" or who "does not allege that he ever spoke to [defendants] or had knowledge of any specific reports or materials that [defendants] reviewed that would have put [defendants] on notice of improper accounting.").  Testimony of a confidential witness will be rejected if it fails to identify "what interaction, if any, [former employees] had with Defendants, or any other information indicating how [former employees] would be in a position to know what senior [ULTA] executives discussed." *In re Adecco S.A. Sec. Litig.*, 434 F. Supp. 2d 815, 830 (S.D. Cal. 2006).

---

(S.D.N.Y. 2000) ("The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders.").

Plaintiffs' former employees provide no useful insight into what Kirby or Bodnar knew or when they knew it. Tellingly absent from the dozens of paragraphs of former employee allegations is even a single conversation or meeting in which either Kirby or Bodnar was made aware of any of the alleged inventory problems. Indeed, FE 1 and FE 3 do not once mention even the names Bodnar and Kirby, let alone what either knew about the alleged inventory problems at the time they signed the Prospectus. None of these former employees purports to have any knowledge – even speculative knowledge – about what Kirby and Bodnar were told or discussed regarding inventory levels at any point in time. *See Career Educ. Corp.*, 2007 WL 1029092, at *9 .

Instead of alleging meetings that would have put Bodnar and Kirby on notice, the Amended Complaint makes vague reference to irrelevant meetings with other (unnamed) ULTA employees that none of the former employees attended. FE 1 references "weekly and daily meetings at corporate headquarters," which were attended by some ULTA officers and employees but not Kirby, Bodnar, or FE 1. AC ¶93(a)(v). Not only does FE 1 fail to allege any statements or discussions regarding ULTA's financial reporting or the IPO, but FE 1 also does not identify a single statement made by *anyone* about *anything* at any of these alleged meetings.

Similarly, FE 2 makes opaque references to two meetings, neither of which FE 2 attended. Plaintiffs provide "[n]o details as to *what* was discussed, or more importantly, that those discussions reflected that Defendants acted with the requisite state of mind." *Adecco*, 434 F. Supp. 2d at 830. Indeed, FE 2 does not even assert that Kirby, Bodnar, or any other ULTA officer attended the meetings. FE 2 offers only the vague and speculative conclusion that based on the results of these meetings – that FE 2 did not attend and cannot describe – "ULTA's inventory losses worsened." AC ¶93(b)(ii).

Finally, FE 3's only purported contact with an ULTA officer consisted of "conversations particularly in late 2007" with former Chief Operating Officer Bruce Barkus. AC ¶93(c)(x).  FE 3's account of these conversations is exceedingly vague and does not detail whether Barkus and FE 3 discussed the magnitude of the purported inventory problem or what potential impact it might have, if any, on ULTA's reported third quarter numbers.  In fact, it is not possible to determine in light of FE 3's imprecision whether these alleged conversations occurred before or after the IPO.  FE 3 alleges only that "Barkus indicated he would look into the problems." *Id.* Moreover, FE 3 nowhere states that Barkus ever communicated the substance – whatever that may have been – of these conversations to Kirby or Bodnar during the preparation of the Prospectus or ULTA's financial statements.  *See Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007) ("The existence of one line of communication between CW1 and a non-defendant officer . . . is not sufficient to support a theory of scienter").

Nor is plaintiffs' theory of scienter advanced by the former employees' vague references to internal reports.  *See supra* at I(A)(2)(a).  Because none of the former employees identify the specific contents of any report, or whether Kirby or Bodnar ever saw any such report, none of these witnesses has any relevant information regarding the scienter of any defendant.[25]

In sum, plaintiffs' allegations fail to give rise to a strong, or indeed *any*, inference of scienter.  Plaintiffs' purported circumstantial evidence is limited to hindsight "must have known" allegations and the irrelevant statements of three unreliable former employees.  Plaintiffs also fail to show why Kirby or Bodnar would be motivated to commit securities fraud knowing that they could not reap any financial gain from it.  None of this, alone or aggregated, suffices to create a

---

[25]  *See, e.g., Bally II*, 2007 WL 551574, at *8 ("CW1 does not allege that he ever spoke with [defendant] or had knowledge of any specific reports or materials that [defendant] reviewed that would have put him on notice . . . It strikes us that CW1's conclusions about [defendant] are another species of the 'must have known' allegations about senior executives that we rejected in *Bally I*").

strong inference that Kirby or Bodnar acted with scienter.

## II.     THE SECTION 11 AND 12 CLAIMS FAIL AS A MATTER OF LAW

Plaintiffs' remaining substantive claims under Sections 11 and 12 also fail for several

reasons.  First, plaintiffs fail to plead their three categories of omissions with particularity as

required by Rule 9(b) and thus the Amended Complaint fails to plead an actionable omission

under Sections 11 and 12.  Second, the Amended Complaint does not establish that any of the

defendants are statutory sellers as required to state a Section 12 claim.  Third, the Amended

Complaint nowhere establishes that any of the lead plaintiffs has standing to sue under Section

12.  Finally, without a cognizable injury, plaintiffs' Section 11 claim fails as a matter of law.

### A.     Plaintiffs' Section 11 And 12 Claims Do Not Satisfy Rule 9(b)

Section 11 imposes liability when a Registration Statement contains a material

misrepresentation or omission.  15 U.S.C. § 77k(a).  Section 12 similarly creates liability for

misrepresentations and omissions appearing in a Prospectus.  15 U.S.C. § 77l(a)(2).  Unlike

Section 10(b), scienter is not an element of a Section 11 or 12 claim.  Nonetheless, where, as

here, Sections 11 and 12 claims sound in fraud, they are subject to the heightened pleading

requirements of Rule 9(b).[26]  *See, e.g., ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 69 (1st

Cir. 2008); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006);

*Chubb*, 394 F.3d at 160; *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004); *Lone Star Ladies*

*Inv. Club v. Scholtzky's, Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); *In re Stac Elec. Sec. Litig.*, 89

F.3d 1399, 1404-05 (9th Cir. 1996).

---

[26]     Though the Seventh Circuit has indicated that Section 11 and 12 claims sounding in fraud are
governed by the heightened pleading standards of Rule 9(b), *see Sears v. Liken*, 912 F.2d 889, 892 (7th
Cir. 1990), a handful of lower court decisions have disregarded this instruction, *see, e.g., Friedman v.
Rayovac Corp.*, 295 F. Supp. 2d 957 (W.D. Wisc. 2003); *In re First Merch. Acceptance Corp. Sec. Litig.*,
No. 97-2715, 1998 WL 781118 (N.D. Ill. Nov. 2, 1998).  No persuasive value attaches to any of these
decisions.  They conflict with the current weight of authority that applies Rule 9(b) to Section 11 and 12
claims that sound in fraud.

Consistent with this authority, plaintiffs' Section 11 and 12 claims do not meet Rule 9(b)'s pleading requirements. For one, plaintiffs employ language "classically associated with fraud," such as their repeated assertions that the Prospectus was false and misleading. *See Rombach*, 335 F.3d at 172 ("[T]he wording and imputations of the complaint are classically associated with fraud: that the Registration Statement was inaccurate and misleading; that it contained untrue statements of material facts; and that materially false and misleading written statements were issued."). Second, the omissions underlying the Section 11 and 12 claims lie at the heart of – and in fact mirror – the alleged scheme to defraud asserted under Section 10(b). *See In re Metricom Sec. Litig.*, No. 01-4085, 2004 WL 966291, at *24 (N.D. Cal. Apr. 29, 2004) ("Plaintiffs cannot . . . scissor out a non-fraud claim from the center of that unified course of conduct in order to evade the Rule 9(b) requirement.").

Moreover, it is irrelevant that the Amended Complaint purports to "expressly disclaim any claim of fraud or intentional misconduct." AC ¶41. "The purpose of [Rule 9(b)] is to protect a defendant's good will and reputation when that defendant's conduct is alleged to have been fraudulent." *Wagner*, 464 F.3d at 1278. Allowing a claim under Section 11 or 12 to escape Rule 9(b) through disclaimers defeats this purpose. "It would strain credulity to claim that Rule 9(b) should not apply in this allegation: The defendant is a no good defrauder, but, even if he is not, the plaintiff can still recover on the simple untruth of the otherwise fraudulent misstatement." *Id.* Indeed, because the touchstone of the inquiry is the substance of the allegations in the Amended Complaint – not plaintiffs' characterizations – any allegation that purports to disclaim fraud is irrelevant. *See Rombach*, 355 F.3d at 172.

As discussed above, the Amended Complaint does not meet the Rule 9(b) pleading standard. In particular, it does not plead any particularized facts to support the contention that

the purported omissions rendered the Prospectus materially false and misleading as of the date of the IPO. First, the Amended Complaint presents no facts from which one might determine the magnitude and thus the materiality of the problems allegedly created by ULTA's new warehouse management software. Second, plaintiffs cannot overcome the fact that ULTA provided all relevant information about its store growth in the Prospectus. Finally, the Amended Complaint does not explain *how* ULTA finalized its third quarter SG&A expenses and inventory levels before the third quarter even ended, *who* compiled and subsequently withheld these numbers, *when* these numbers became available to Kirby and Bodnar, and *what* the numbers said about third quarter SG&A expenses and inventory levels at the time of the IPO.

Nonetheless, not even a lower pleading standard would save the Section 11 and 12 claims. As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), notice pleading means plaintiffs must "identify[] facts that are suggestive enough to render . . . [a claim] plausible," *id.* at 1966. On this point the Amended Complaint fails; it does not present circumstances contemporaneous to the Prospectus that suggest it was materially false and misleading when made. *See SeaChange*, 2004 WL 240317, at *16 ("Plaintiffs allege no facts to support their contention that [earnings] were in fact eroding at the time of the offering."); *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323 (D.N.J. 2000) ("To state a claim under either Section 11 or Section 12, plaintiffs must, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering."); *Zucker*, 891 F. Supp. at 1016. Thus, regardless of whether governed by Rule 9(b) or 8(a), the Section 11 and 12 claims fail as a matter of law because plaintiffs fail to plead a material misstatement or omission in the Prospectus under either standard.

**B.      Defendants Are Not Statutory Sellers Within The Meaning Of Section 12**

Section 12 is limited to those persons who "offer[] or sell[] a security . . . by means of a

Prospectus." 15 U.S.C. § 77l(a)(2).  Plaintiffs must establish a buyer-seller relationship with

defendants.  *Pinter v. Dahl*, 486 U.S. 622 (1988), held that such a relationship arises only where

a defendant (1) "passes title, or other interest in the security, to the buyer for value," or (2)

"successfully solicits the purchase of a security motivated at least in part by a desire to serve his

own financial interest or those of the security owner," *id.* at 647.  Lacking an allegation that any

defendant falls into either category, the Amended Complaint fails to state a Section 12 claim.

First, ULTA never passed title to plaintiffs because the IPO occurred pursuant to a firm

commitment underwriting – where an issuer sells shares directly to underwriters at a discount

from the offering price.  *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99-

12046, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001).  The underwriters, who assume all

risk for unsold inventory, pass title to broker-dealers and investors.  *Id.*  In this case, ULTA sold

all of its common stock to five underwriters, who then sold the common stock directly to the

public.  *See* Prospectus (Ex. 1) at 113.  As a result, not one defendant sold ULTA common stock

directly to the public and thus not one passed title to plaintiffs.  *See In re Deutsche Telekom AG

Sec. Litig.*, No. 00-9475, 2002 WL 244597, at *4 (S.D.N.Y. Feb. 20, 2002) ("because a buyer

cannot recover from a seller's seller, the first test of who is a seller pursuant to section 12(a)(2)

cannot be satisfied").

Second, the Amended Complaint presents only a bald legal assertion that the defendants

solicited plaintiffs' purchases of ULTA common stock:  "Defendants were sellers, offerors,

and/or solicitors of purchasers of the shares offered pursuant to the IPO and Prospectus."  AC

¶62.  Because solicitation is a legal term of art under Section 12, this boilerplate language will

not suffice.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003).  The Amended

Complaint must come forward with factual allegations beyond signatures on the Prospectus to plead solicitation. *See Lone Star Ladies*, 238 F.3d at 370 ("Virtually all issuers routinely promote a new issue, if only in the form of preparing a Prospectus and conducting a road show"). Failing to do so, the Amended Complaint does not state a claim under Section 12.

### C.    Plaintiffs Do Not Have Standing To Sue Under Section 12

Statutory standing under Section 12 requires a purchase of the security at issue directly in the IPO.[27] An aftermarket purchase does not suffice. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 579-81 (1995) ("Congress contemplated that § 12(2) would apply only to public offerings by an issuer"); *Ong v. Sears, Roebuck & Co.*, No. 03-4142, 2005 WL 2284285, at *13 (N.D. Ill. Sept. 14, 2005). Not one named lead plaintiff adequately pleads the purchase of a stock directly in the ULTA IPO from one of the five underwriters. Fischer and Carroll purchased ULTA common stock at prices of $32.48 and $29.65 per share, respectively, well above the offering price of $18.00. Accordingly, neither of these two lead plaintiffs may pursue a Section 12 claim.

This leaves Mirsky, who nebulously – and in stark contrast to the certifications filed by the other two lead plaintiffs – asserts he purchased ULTA common stock "in its initial public offering." This conclusory pleading fails on two accounts. First, it does not comply with the PSLRA, under which Mirsky must detail "all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. § 78u-4(a)(2)(A)(iv). Second, it does not indicate from whom Mirsky purchased ULTA common stock, when the purchase occurred, or how much Mirsky paid for his shares of ULTA common stock. *See In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F. Supp. 2d 216, 246

---

[27]    Standing, a threshold requirement to a federal class action, is distinct from the class certification requirements of FEDERAL RULE OF CIVIL PROCEDURE 23. *See Modell v. Eliot Sav. Bank*, 139 F.R.D. 17, 20 (D. Mass. 1991) ("When the issue of standing is raised by a party, this Court must resolve that issue before considering the class certification requirements of Rule 23.").

(E.D.N.Y. 2002) (plaintiffs must "specify at the pleading stage whether they made the[ir] purchases in the offering or in the secondary market"); *Ong*, 2005 WL 2284285, at *14 ("Plaintiffs surely do not need discovery to determine whether that purchase was from an initial public offering or the secondary market."). Without such facts, the Amended Complaint does not present "plausible grounds to infer" that Mirsky purchased ULTA common stock directly in the IPO from one of the five underwriters. *See Bell Atl. Corp.*, 127 S. Ct. at 1965. As a result, the Section 12 claim should be dismissed. *See Griffin v. PaineWebber, Inc.*, No. 99-2292, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) ("[I]t is well established that if none of the named plaintiffs purporting to represent a class established the requisite case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

### D.    The Amended Complaint Does Not Establish Recoverable Damages Under Section 11

Not only does the Section 11 claim fail without an actionable omission, it fails without any indication that plaintiffs suffered damages. *See Ong*, 2005 WL 2284285, at *14. Section 11 damages are capped at the difference between the amount a purchaser paid for the security (not to exceed the offering price) and the value of the security at the time the lawsuit was filed. 15 U.S.C. § 77k(e). The date of the original complaint – not any later amended complaint – controls. *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1541-44 (8th Cir. 1996).

In this case, ULTA common stock was sold to the public at a price of $18.00 per share. *See* Prospectus (Ex. 1) at 25. The day Mirsky filed the initial complaint, December 17, 2007, ULTA stock opened at $18.60. *See* Price Chart (Ex. 2). Because ULTA stock traded above its offering price on December 17, 2007, plaintiffs suffered no losses under Section 11. *See Stark Trading & Shepherd Inv. Int'l, Ltd. v. Falconbridge Ltd.*, No. 05-1167, 2008 WL 153542, at *17-18 (E.D. Wisc. Jan. 14, 2008) (no Section 11 claim where lawsuit trading price exceeded

offering price); *In re AOL Time Warner, Inc. Sec. Litig. & ERISA Litig.*, 381 F. Supp. 2d 192,

246 (S.D.N.Y. 2004) (same).  Without a cognizable injury, the Section 11 claim should be

dismissed.

## III.    THE CONTROL PERSON CLAIMS FAIL AS A MATTER OF LAW

Sections 15 of the '33 Act and 20(a) of the '34 Act render control persons jointly and

severally liable for primary securities laws violations committed by persons under their control.

For the reasons set forth above, the Amended Complaint does not claim a predicate violation

under Section 11 and 12 of the Securities Act or Section 10(b) of the Securities Exchange Act.

Accordingly, the claims under Sections 15 and 20(a) are subject to dismissal without any

underlying violation of the federal securities laws.  *See, e.g.*, *Tabankin v. Kemper Short-Term

Global Income Fund*, No. 93-5231, 1994 WL 30541, at *6 (N.D. Ill. Feb. 1, 1994) (dismissal of

Section 15 and 20(a) claims upon dismissal of primary claims under Sections 11 and 10(b)).

CONCLUSION

Each claim raised in the Amended Complaint should be dismissed with prejudice.  This is

the second complaint filed and more than seven months have passed since the events giving rise

to this case, affording plaintiffs ample time to investigate and plead a viable claim.  As a result,

any further amendment would be futile and the Amended Complaint should be dismissed with

prejudice.  *See, e.g., Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 311 (S.D.N.Y. 2000).

Dated:  July 21, 2008                              Respectfully submitted,

                                                   By: s/ Sean M. Berkowitz

                                                   **LATHAM & WATKINS LLP**
                                                   Sean M. Berkowitz
                                                   Michael J. Faris
                                                   Nicholas B. Gorga
                                                   Sears Tower, Suite 5800
                                                   233 South Wacker Drive
                                                   Chicago, Illinois 60606
                                                   Tele: (312) 876-7700
                                                   Fax: (312) 993-9767

                                                   *One of the Attorneys for Defendants Ulta*
                                                   *Salon, Cosmetics & Fragrance, Inc., Lynelle*
                                                   *P. Kirby and Gregg R. Bodnar*