# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE ULTA SALON COSMETICS & FRAGRANCE, INC. SECURITIES LITIGATION | : : : : | No. 07 C 7083 |
| This Document Relates To: All Actions | : : : | Hon. Robert W. Gettleman |

## LEAD PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS, APPROVAL OF NOTICE PLAN, AND SETTING OF FAIRNESS HEARING

Lead Plaintiffs, by their undersigned counsel, hereby move pursuant to Fed. R. Civ. P. 23(e) for an order granting preliminary approval of the proposed class action settlement in this case, preliminarily certifying the class, scheduling a fairness hearing, directing that class members be notified of the proposed settlement and of their rights with respect thereto, and for related relief (proposed "Preliminary Approval Order"). In support of this motion, Lead Plaintiffs state as follows:

## I. SUBSTANTIVE ALLEGATIONS OF THE AMENDED COMPLAINT

The action arises out of false and misleading statements Lead Plaintiffs allege Defendants made in the registration statement and prospectus (the "Prospectus") for the October 25, 2007 initial public offering ("IPO") of the common stock of Ulta Salon, Cosmetics & Fragrance, Inc. ("Ulta"). Defendants are Ulta, its Chief Executive Officer, Lynelle P. Kirby ("Kirby") and its Chief Financial Officer, Gregg R. Bodnar ("Bodnar"). The causes of action arise under Sections 11 and 12 of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"). The Amended Complaint is brought by Lead Plaintiffs on behalf of a class of

purchasers of the common stock of Ulta in the IPO and in the open market between October 25, 2007 and December 10, 2007 (the Class").

Defendants launched the IPO nine business days prior to the close of Ulta's Third Quarter and, therefore, did not include any financial information concerning Ulta's Third Quarter in the Prospectus. The Prospectus included financial information only through August 4, 2007, the end of Ulta's second quarter. Lead Plaintiffs allege that defendants failed to disclose in the prospectus for the IPO material facts concerning Ulta's selling, general and administrative expenses ("SG&A expenses") and merchandise inventory levels in the Third Quarter. Lead Plaintiffs allege that these nondisclosed material facts rendered the prospectus false and misleading.

### A. Ulta's Positive Trends In Its SG&A Expenses Are Prominently Discussed In The Prospectus

Ulta's SG&A expenses had risen markedly in the Third Quarter and were contrary to the historical trend discussed in the Prospectus, Amended Complaint ¶¶44 and 46, and, in fact, were 36% higher than the prior year's fiscal third quarter, Amended Complaint ¶38. These facts were omitted from the Prospectus.

Instead, throughout the Prospectus, including in the financial tables, Defendants reported the positive financial trends in Ulta's business, including the positive trends in its SG&A expenses, making it quite apparent that Ulta had been successful in executing its growth strategy through the Second Quarter, without sacrificing its historical positive financial trends. Amended Complaint ¶28. The Prospectus stated that SG&A expenses as a percentage of net sales was 25.1% for the six months ended August 4, 2007, the same percentage it had been for the comparable six months ended July 29, 2006. Amended Complaint ¶29. The financial tables in the Prospectus showed, on an annual and quarterly basis, respectively, that since January 29, 2005, Ulta's SG&A expenses as a percent of net sales had increased only modestly from 24.8% at January 29, 2005 to 25.1% at August

2

4, 2007. Amended Complaint ¶¶29, 44(a). Thus, while net sales grew 54% during that three-year period to $755 million, SG&A expenses increased by only 0.1% and, on a quarterly basis, Ulta's SG&A expenses for the Second Quarter, were less as a percentage of net sales than they were in the first quarter of 2005. Amended Complaint ¶30. Thus, the Prospectus made it clear that Ulta had a long trend of growing its sales revenue without increasing its SG&A expenses as a percentage of those sales. *Id.*

> **B.     Ulta's Positive Trends In Its Merchandise Inventories Are Prominently Discussed In The Prospectus**

The levels of Ulta's merchandise inventories had risen sharply in the Third Quarter and were contrary to the historical trend discussed in the Prospectus, Amended Complaint ¶¶45 and 46, and, in fact, were 40% higher than the prior year's fiscal third quarter, Amended Complaint ¶39. These facts were omitted from the Prospectus.

Instead, Defendants reported the positive trends in Ulta's merchandise inventories through the Second Quarter throughout the Prospectus. At February 3, 2007, the merchandise inventories carried on Ulta's balance sheet were $129 million, 17% of net sales. At January 28, 2006, the merchandise inventories carried on Ulta's balance sheet were $109 million, 18.5% of net sales. Amended Complaint ¶31. This decline in merchandise industry levels as a percent of net sales was a very positive trend. Defendants emphasized Ulta's 30 consecutive quarters of sales growth while controlling its inventory levels and the fact that Ulta's merchandise inventories at the end of the Second Quarter had risen by only 15% from February 3, 2007, to $148.6 million. Amended Complaint ¶¶25-27, 31.

> **C.     Defendants Misrepresent The Truth In The Prospectus**

Unbeknownst to the market, however, Ulta's operations and financial condition for the Third Quarter to date were materially contrary to the trends disclosed in the Prospectus. Both Ulta's

SG&A expenses and merchandise inventories in the Third Quarter had spiked dramatically. Merchandise inventories had increased principally due to the substantial problems experienced in operating Ulta's new WM software system Defendants used to manage Ulta's inventory levels. Amended Complaint ¶36. Additionally, merchandise inventories had increased due to the acceleration in new store openings, Amended Complaint ¶37. As stated in the Prospectus, Ulta's goal was to open 50 stores in fiscal 2007. Defendants opened 25 of them during the Third Quarter. *Id.* Ulta's SG&A expenses had increased principally as a result of the material increase in advertising circulars and expenses in the Third Quarter, which had been incurred prior to the IPO. Amended Complaint ¶38.

### D. Defendants Disclose The Truth

On December 11, 2008, Defendants issued Ulta's Third Quarter earnings press release and held a conference call with securities analysts. In the press release and during the conference call, Defendants announced Ulta's financial results for the Third Quarter and disclosed the substantial increases in Ulta's SG&A expenses and merchandise inventories in the Third Quarter. The market reacted immediately to this adverse disclosure, and the price of Ulta common stock dropped 20.4%. Amended Complaint ¶40.

## II. PROCEDURAL HISTORY OF THE ACTION

Three class actions were filed in this Court commencing December 17, 2007. They were consolidated by Order dated March 18, 2007, and Marc Mirsky, Nedra Fischer and Stephanie Carroll were appointed Lead Plaintiffs. Law Office Bernard M. Gross, P.C. was appointed Lead Counsel and Miller Law LLC was appointed Liaison Counsel.

Lead Plaintiffs filed the Amended Complaint on May 19, 2008, after an extensive factual investigation, including interviews of former Ulta employees. Defendants moved to dismiss the

Amended Complaint on July 21, 2008, pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) and the Private Securities Litigation Act of 1995 ("PSLRA"). After extensive briefing by the parties, the Court denied Defendants' motion and issued its Memorandum Opinion and Order, dated March 19, 2009.

Defendants served their Answer on April 20, 2009, asserting 32 affirmative defenses. Lead Plaintiffs served their document requests on Defendants on April 20, 2009. On May 16, 2009, the Court held a status conference at which, *inter alia*, a schedule was set concerning class certification proceedings.

The parties agreed to seek a resolution of the Action through the offices of a mediator. The parties agreed upon former federal judge Nicholas H. Politan as the Mediator. In connection with the May 29, 2009, mediation, the parties submitted extensive mediation briefs to Judge Politan. Lead Counsel, in preparing the mediation brief, engaged in further consultation with experts in evaluating the strengths and weaknesses of the allegations of the Amended Complaint and Defendants' defenses. The mediation itself included discussion and analysis of disputed legal and factual issues, including those relating to class-wide damages, on both the Section 11 claim and the Section 10(b) claim, loss causation, and Defendants' *scienter*.

The mediation conducted by Judge Politan was successful, and the parties agreed to the settlement, in principle, in the amount of $3.75 million in cash. The terms and conditions of the $3.75 million class action settlement have now been documented in the Stipulation and Agreement dated June 29, 2009 ("Settlement Agreement"), attached hereto as Exhibit A.

## III. ARGUMENT

### A. Legal Principles Governing Preliminary Approval of Class Action Settlements

It is well established that there is an overriding public interest in settling and quieting

litigation, and this is particularly true in class actions. *See Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied,* 478 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong v. Board of School Directors of the City of Milwaukee,* 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement.") Class action settlements minimize the litigation expenses of both parties and reduce the strain such litigation imposes upon already scarce judicial resources. *Armstrong,* 616 F.2d at 313 (*citing Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977)).

The central issue before the Court is whether the proposed Settlement is sufficiently within the range of what might be approved as fair, reasonable and adequate to justify sending and publishing notice to class members and scheduling a final hearing. *See Armstrong,* 616 F.2d at 314, *overruled on other grounds by Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998) ("The courts of appeals have required that district court approval of a settlement pursuant to Rule 23(e) be given only where the district finds the settlement fair, reasonable and adequate."). The Court is not required at this juncture to make a final determination that the Settlement is fair and reasonable. Nor will any class members' substantive rights be determined or prejudiced by preliminary approval. Thus, "[i]f the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies…and appears to fall within the range of possible approval," the Court should direct notice to issue and schedule a final approval hearing. MANUAL FOR COMPLEX LITIGATION THIRD, §30.41 at 297 (2003).

## B.     The Seventh Circuit's Standards Governing Class Action Settlements

A court has wide discretion in making the first-stage determination of the appropriateness of

a settlement. *Armstrong*, 616 F.2d at 313. The Supreme Court has cautioned, however, that in reviewing a proposed class settlement, a court should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986); *Isby v. Bayh*, 75 F.3d 1191, 1196-97 (7th Cir. 1996). Because the object of settlement is to avoid, not confront, the determination of contested issues, the approval process should not be converted into an abbreviated trial on the merits. *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1987) ("the district court need not undertake the type of detailed investigation that trying the case would involve"). Instead, a court's inquiry should be "limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Isby*, 75 F.3d at 1196.

The Seventh Circuit has identified six factors for analyzing whether a class action settlement should be given final approval. These factors, equally germane in deciding whether to give preliminary approval to a proposed settlement, are:

1)   the strength of the plaintiff's case on the merits measured against the terms of the settlement,

2)   the complexity, length, and expense of continued litigation,

3)   the amount of opposition to the settlement,

4)   the presence of collusion in gaining a settlement,

5)   the stage of the proceedings, and

6)   the amount of discovery completed.

*See, e.g., General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997).

1.    **The Strength of Plaintiffs' Case Measured Against the Settlement**

Lead Plaintiffs, through Lead Counsel, believe that the evidence they uncovered during their independent factual investigation, as well as the sources of that evidence, as detailed in the Amended Complaint, would enable Lead Plaintiffs to establish the facts alleged in the Amended Complaint at trial. There is no real dispute among the parties as to the levels of Ulta's SG&A expenses and inventories at the time of the IPO. It is hotly contested, however, whether those facts were material, whether Defendants' alleged misrepresentations caused any inflation in the market price of Ulta's common stock and whether Defendants possessed the requisite scienter with respect to those facts. For example, although the Court found, in denying the motion to dismiss, that there was a sufficient factual basis for pleading Defendants' knowledge of the facts, Defendants steadfastly cling to their position that they did not believe that Ulta's levels of SG&A expenses and inventories in the Third Quarter, which had not closed by the date of the IPO, had to be disclosed in the Prospectus.

This case presented many risks and uncertainties relating to liability and damages, including the size of any potential relief that could be obtained for the Class, all of which were discussed in depth during the mediation with Judge Politan. Lead Plaintiffs' ability to establish the materiality of the alleged false and misleading statements made in the Prospectus for the IPO and loss causation presented a significant risk. Although the price of Ulta common stock price dropped upon the disclosure of the rise in Ulta's SG&A expenses and merchandise inventory levels in the Third Quarter, the price of Ulta's common stock did not initially fall below the IPO price. In addition, the Third Quarter earnings press release and conference call disclosed many other facts concerning Ulta's current and future business and financial condition. None of the securities analysts on the earnings conference call voiced concern over the rise in Ulta's SG&A expenses and merchandise inventory levels that was disclosed in the press release. In fact, Ulta's financial results for the Third

Quarter were acceptable to the market, according to analyst reports. Thus, Lead Plaintiffs faced the significant risk that they would not be able to establish either materiality or loss causation. *See Dura Pharmaceuticals, Inc.*, v. *Broudo*, 544 U.S. 336 (2005) ("*Dura*").

Another significant risk Lead Plaintiffs faced in proving liability was their ability to establish reliance. Plaintiffs typically rely on the "fraud-on-the-market" theory to establish reliance in an open market fraud case. The availability of the fraud-on-the-market doctrine turns, in part, on the existence of an efficient market for the stock at issue. There is law holding that there is no efficient market for a stock which is issued in an initial public offering. See, *In re IPO Securities Litig.*, 471 F.3d 24, 42-43(2d Cir. 2006).

In addition, Lead Plaintiffs faced a serious risk in establishing the extent of damages. With respect to the Section 11 claim, the statutory measure of damages yielded a very small $0.14 per share. In addition, as permitted by the Securities Act, Defendants, in the nature of an affirmative defense, would argue that none of the stock price decline was attributable to the alleged misstatements. In fact, when the price of Ulta common stock dropped on December 11, 2007, the closing price was still above the October 25, 2007, IPO price of $18.

With respect to damages under Section 10(b) of the Exchange Act, Lead Plaintiffs faced the risk that damages would be greatly reduced by the application of *Dura*. It is arguable whether the increase in the market price of Ulta common stock during the Class Period above the $18 per share IPO price was causally related to the alleged misrepresentations. Defendants did not make any statements to the market during the Class Period after they issued the Prospectus for the IPO. Although the price of Ulta common stock traded throughout the Class Period at prices significantly above the $18 IPO price, the price did not fall below the $18 IPO price when the truth was disclosed on December 11, 2007. Thus, it was a significant risk whether Lead Plaintiffs could legally claim

the class-period inflation in the price as part of their measure of damages. In addition, recent case law, including *Dura*, supports the reduction of damages by eliminating any Class Member whose loss was caused by his having purchased and sold his shares during the Class Period. And, under the PSLRA, any class member who made a profit by selling his stock during the 90-day period following the close of the Class Period has no legally cognizable damages.

Lead Plaintiffs submit that the Court should find that this factor weighs in favor of preliminary approval.

### 2. The Complexity, Length and Expense of Continued Litigation if the Settlement is not Approved

Many complex legal and factual issues would have to be decided if the Settlement had not been reached. These issues relate to the materiality of Lead Plaintiffs' factual assertions of misrepresentation, loss causation, Defendants' scienter, and proof and calculation of damages. The proposed Settlement makes final decision on these disputed factual and legal issues unnecessary.

If the case had not settled, the expenses of litigation going forward would have included the time and expense of pre-trial orders, summary judgment motion practice, as well as costs associated with trial and likely appeals. This expenditure of time and money would have been substantial. Further, likely appeals of any summary judgment decision or final judgment all but ensured that this litigation would have dragged on without resolution or relief for several years. One of the major benefits of this Settlement is providing a prompt recovery to the Class, without the additional major expenditures of time and money. Again, Lead Plaintiffs submit that the Court should find that this factor weighs in favor of approval.

### 3. The Amount of Opposition to the Settlement

At the current stage of the litigation, prior to class notice, no members of the Settlement Class have indicated any objections to the proposed Settlement.

### 4. The Presence of Collusion in Gaining a Settlement

As a matter of law, a court, in the absence of evidence to the contrary, should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion. *Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 681-82 (7th Cir. 1987); *Armstrong*, 616 F.2d at 325. 4 Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS §11.41 (4th Ed. 2002) *("NEWBERG ON CLASS ACTIONS")*.

While this presumption is applicable here, Lead Plaintiffs do not rest on it. The Settlement was reached only after arm's-length negotiations presided over by Judge Politan, a former federal judge who is widely respected and utilized as a mediator of similarly complex class actions. The Settlement is not the product of collusion in any way. *See* Gross Declaration.

### 5. and 6. The Stage of the Proceedings and the Amount of Discovery and Investigation Completed When Settlement was Achieved

The proposed Settlement was reached after the Amended Complaint was filed, after Defendants' motion to dismiss had been denied by the Court, and as a result of the mediation before Judge Politan. Throughout that process, Lead Plaintiffs gathered a large amount of factual evidence that supported their factual allegations, primarily as the result of interviews with former Ulta employees. Lead Counsel's factual investigation and their legal analysis, both aided by the mediation process, have enabled Lead Plaintiffs, through their Lead Counsel, to develop a very good working knowledge of the strengths and weaknesses of their case and Defendants' defenses. Thus, there was a substantial factual basis upon which experienced class counsel could evaluate and assess what would be a fair settlement for this case.

### C. Conditional Certification of Class for Settlement Purposes

The law in the Seventh Circuit is clear that cases which are arguably inappropriate for class treatment on a fully-litigated basis may be entirely appropriate for class treatment on a settlement

basis. In *Carnegie v. Household International, Inc.*, 376 F.3d 656 (7th Cir. 2004), the Seventh Circuit made clear that class actions involving many individual issues may not only be appropriate for class treatment, they may be the preferable manner for litigating the individual claims. Further, the settlement of cases involving many individual issues is to be encouraged in this Circuit. The Court stated:

> The defendants are correct, however, that a class might be suitable for settlement but not for litigation. The class might be unmanageable if the case were actually tried yet manageable as a settlement class because the settlement might eliminate all the thorny issues that the court would have to resolve if the parties fought out the case. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).

*Id.* at 660-661.

There is no need for this Court to engage in this debate as all members of the Class have been treated similarly because Defendants made uniform, written misleading statements in the Prospectus for the IPO and made no other statements during the Class Period. All of the elements of Rule 23(a) and (b)(3) are satisfied. Lead Plaintiffs and the members of the Class satisfy the numerosity requirement and they share common questions of law or fact which predominate over any individual questions. Lead Plaintiffs' claims are typical of the claims of all Class Members, and Lead Plaintiffs have exhibited their adequacy as class representatives. Lead Counsel is qualified to serve as Lead Counsel. Finally, a class action is clearly a superior means for litigating the claims alleged in the Amended Complaint.

A litigation class would clearly be appropriate in this case, and this Court should conditionally certify a settlement class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

### D.     The Plan of Allocation Distribution

The Settlement Agreement calls for the Court, as part of the settlement approval process, to also approve the Plan of Distribution of the Net Settlement Fund to Class Members.

Here, the Plan of Distribution provides that the Recognized Loss for each share of Ulta common stock purchased at any time during the Class Period and not sold prior to December 11, 2007 is $6.59, the amount of the stock price drop on December 11, 2007. Any member of the Class who sold his Ulta common stock before December 11, 2007, will not have a Recognized Loss. Every member of the Class has both Section 11 and Section 10(b) damages and, thus, there is no need, in the facts or the law, to distinguish between those two measures of damage.

This Plan of Distribution, developed in consultation with Lead Plaintiffs' expert, is fair and reasonable, based on applicable law and the trading prices of Ulta common stock during and after the Class Period.

### E.     The Proposed Settlement Notice Satisfies Rules 23(e) and Due Process Requirements

Lead Counsel proposes that mailed and published notice be given in the form of the Class Notice and Summary Notice, attached as Exhibits A and D, respectively, to the Settlement Agreement. The Notice will be mailed to all shareholders of record. The Summary Notice also will be published on the internet. Notice to the Class in the form and in the manner set forth in the proposed Preliminary Approval Order fulfills the requirements of due process, complies with the Federal Rules of Civil Procedure, and alerts and informs members of the Class of the Settlement and their opportunity to appear and be heard at the Fairness Hearing.

Due process is satisfied where the notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). Notice should also provide a very general description of the proposed settlement. *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2d Cir. 1982).

The proposed forms of Class notice describe in plain English the terms and operation of the Settlement, the proposed Plan of Distribution, the considerations that caused Lead Counsel to conclude that the Settlement is fair and adequate, the maximum attorneys' fees and expenses that Lead Counsel, on behalf of all Plaintiffs' Counsel, will seek, the procedure and deadlines for objecting to the Settlement and to the request for attorneys' fees and expenses, the certification of the Class, the procedure and deadline for filing a request for exclusion from the Class, the procedure and deadline for filing a proof of claim, and the date and place of the Fairness Hearing.

The notices more than fairly apprise Class Members of the Settlement and their options with respect thereto and fully satisfy all due process requirements. *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1177 (9th Cir. 1977) (notice must only apprise class members of the subject matter of the suit, the proposed terms of the settlement, and the members' opportunity to be heard). The combination of mailed and published notice is the "long-accepted norm in large class actions." *Gordon v. Hunt,* 117 F.R.D. 58, 63 (S.D.N.Y. 1987). Publication of notice on the internet satisfies the PSLRA's requirement for publication notice of securities class actions. *Greebel v. FTP Software, Inc.,* 939 F. Supp. 57, 62 (D. Mass. 1996); *Greenberg v. Bear Stearns & Co.,* 80 F. Supp. 2d 65, 68 (E.D.N.Y. 2000). In *In re Global Crossing Sec. and ERISA Litig.,* 225 F.R.D. 436, 448-49 (S.D.N.Y. 2004), the court found that internet notice, combined with individual mailings, satisfied Rule 23.

The form and manner of notice proposed here clearly fulfill the requirements of Fed. R. Civ. P. 23 and due process.

At the Fairness Hearing, members of the Settlement Class who have timely served their notices of intention to appear may voice their objections. The Court can then consider the merits of the Settlement in light of any objections and determine whether to grant final approval of the Settlement. Lead Counsel will have submitted briefs and other documents in support of the Settlement and in support of their request for attorneys' fees and reimbursement of expenses, and the Court will be asked to determine the appropriate amounts to be awarded. If the Court finds the Settlement fair and reasonable, the Court should then enter the proposed Final Order and Judgment at that time, dismissing this Action with prejudice and releasing the claims as provided for in the Settlement Agreement.

## IV.    CONCLUSION

Lead Plaintiffs respectfully request that this Court make a preliminarily finding that the Settlement is reasonable and fair, and that notification to the Settlement Class of the terms of the Settlement and of their rights in connection with the Settlement is warranted and direct that such notice of the settlement be given to members of the Class.

Dated: July 10, 2009                    Respectfully submitted,


By: */s/ Marvin A. Miller*
　　　 Marvin A. Miller
　　　 Lori A. Fanning
　　　 **Miller Law LLC**
　　　 115 S. LaSalle Street
　　　 Suite 2910
　　　 Chicago, Illinois 60603
　　　 Telephone: 312.332.3400

　　　 *Lead Plaintiffs' Liaison Counsel*

　　　 Deborah R. Gross
　　　 Robert P. Frutkin
　　　 **Law Offices  Bernard Gross, P.C.**
　　　 100 Penn Square East, Suite 450
　　　 Philadelphia, PA 19107
　　　 (215) 561-3600

　　　 *Lead Plaintiffs' Lead Counsel*